M HN

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## CHICAGO DIVISION

| | |
|---|---|
| PHILANDERS HARDY and )<br>TRACY HARDY )<br> )<br>     Plaintiffs, )<br> )<br>v. )<br> )<br>AMTEC FUNDING GROUP LLC,)<br>HOMEQ SERVICING CO. )<br>NEW CENTURY MORTGAGE )<br>CORPORATION, REAL SOURCE)<br>TITLE LLC, COUNTRYWIDE )<br>HOME LOANS )<br> )<br>     Defendants, )<br> )<br> )<br> )<br>_____ ) | CIVIL ACTION NO.<br><br>08CV4465<br>JUDGE MORAN<br>MAGISTRATE JUDGE VALDEZ |

FILED

AUG 0 7 2008 TC
8 - 7- 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT FOR PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF

COMES NOW, Philanders Hardy, Plaintiff in the above styled

matter and files this Memorandum of Law in Support of its Complaint for

Permanent Injunction and other Equitable Relief.

## TABLE OF CONTENTS

                                                      **Page**

**TABLE OF AUTHORITIES**.................................................ii

**INTRODUCTION**..................................................................1.

**JURISDICTION AND VENUE**...........................................2-3

**PARTIES**...........................................................................4-9

**VIOLATIONS/MISREPRESENTATIONS**...........................10–20

**INJURY**..............................................................................20

**PRAYER**............................................................................20

# TABLE OF AUTHORITIES

**TRUTH IN LENDING ACT (TILA) 15 U.S.C. § 1635(b); Reg Z §§ 226.15(d)(1), 226.23(d)(1). §§ 226.15 and 226.23**

**HOEPA (Predatory Lending Practices) 15 U.S.C. § 1602(aa)(1)(A); Reg Z § 226.32(a)(i)**

## Cases

Deutsche Bank v Coley 05220/2007 (26 Mar 2008)

Smith v. Wells Fargo Credit Corp., 713 F. Supp. 354(D.Ariz.1989)

In re Laubach, 77 B.R. 483 (bankr. E. D. Pa. 1987)

CF. Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704-05 (9th Cir.1986)

Perkins, 106 B.R. 863, 874(Bankr. E.D. Pa. 1989); In re Brown, 134 B.R. 134 (Bankr. E.D. Pa. 1991); In re Moore, 117 B. R. 135 (Bankr. E.D. Pa. 1990)

Fed. R. Civ. P.8(a)

Brown v. Mortgagestar, 194 F. Supp. 2d 473 (S.D.W.Va.2002) (notice pleading is all that is required in a TILA case)

## INTRODUCTION

On August 11, 2006 Philanders Hardy and Tracy Hardy received a loan in the Amount of One Hundred Ninety-Two Thousand One Hundred Dollars and 00/100 (U. S. $ 192,100.00   ) from AMTEC FUNDING GROUP, LLC. (Lender) A LIMITED LIABILITY COMPANY and existing under the laws of DELAWARE, located at 12453 Bel-Red Road #200, Bellevue, Washington 98005.  Monthly calculation was to be $ 1,664.56. on October 1, 2006 (Loan # 206070706) AMTEC FUNDING GROUP, LLC, Notified Mr. and Mrs. Hardy that the components of their loan would be as follows: $1,664.56 loan payment, Tax Reserves $107.40, and Insurance Reserves $84.17, totaling $ 1,856.13. All payments at this time were to be sent to New Century Mortgage Corporation, located at P. O. Box 514700 Los Angeles, California 90051-4700. On May 21, 2007 the Hardy's got a (Subprime) loan from Countywide Home Loans, Inc., Located at 939 North Avenue Suite 680 Chicago, Ill. 60622. This loan was also at one

time serviced by HomEQ Servicing. (Loan # 0325965549), Payment then reversed to
Countrywide Home Loans (loan # 168607026).

1.    This is an action under Sections 5(a), 13(b), and 16(a) of the Federal Trade
      Commission Act ("FTC ACT"), 15 U.S.C. §§ 45(a), 53(b), and 56(a), Section
      108(c) of the Truth in Lending Act ("TILA"), 15 U.S.C. § Section 704(c) of
      The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691c(c), and
      Section 621(a) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §
      1681s (a), to secure permanent injunction relief and other equitable relief,
      Including rescission, restitution, reformation, and disgorgement, against for
      Defendants engaging in unfair or deceptive acts or practices in violation of
      Section 5(a) of the FTC Act, as amended, 15 U.S.C. § 45(a), acts or practices
      In violation of the TILA, 15 U.S.C. §§ 1601-1666j, as amended, and TILA's
      Implementing Regulation B, 12 C.F.R. § 226, as amended, acts or practices in
      Violation of the ECOA's implementing Regulation B, 12 C.F.R. § 202, as
      Amended, and acts or practices in violation of the FCRA, 15 U.S.C. § 1681a-
      1681u, as amended.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this matter pursuant to
    15 U.S.C. §§ 45(a), 53(b), 1607(c), 1691c(c), and 1681s (a), and 28 U.S.C. §§

1331, 1337(a), and 1345.

3.  Venue is proper in the United States District Court for the Northern District of

Illinois under 28 U.S.C. § 139(b) and (c), and 15 U.S.C. § 53(b).

## PARTIES

4.  Plaintiffs Philanders Hardy and Tracy Hardy are ordinary citizens trying to

accomplish the American dream by purchasing a home.

5.  Defendant Amtec Funding Group LLC, is a Delaware corporation that

Maintains its principal place of business at 12453 Bel-Red Road # 200

Bellevue, Washington 98005.

6.  Defendant New Century Mortgage Corporation, is a California corporation

Located at 18400 Von Karman Ste 1000 Irvine, CA 92612.

7.  Defendant HomEQ Servicing Corporation, is a New Jersey Corporation

Located at 4837 Watt Ave North Highlands, CA 95660.

8.  Defendant Real Source Title LLC, is a Minnesota corporation located at

3601 Algonquin Road Suite 575 Rolling Meadows Ill 60008.

9.  At all times relevant to this Complaint, defendants Countrywide Home Loans,

Countrywide Financial Services, and Countrywide Bank, together with

subsidiaries (collectively referred to as "Countrywide"), offered financial

products and services to Mr. and Mrs. Hardy. Countrywide disseminated

advertisements to the Hardy's that promoted credit transactions, as the terms

"advertisement" and consumer credit" are defined in Section 226.2 of

regulation Z, 12 C.F.R. § 226.2(a)(17), and as that term is defined in Section

702(e) of the ECOA, 15 U.S.C. § 1691a and Section 202.2(1) of regulation B,

12 C.F.R. § 202.2(1), and therefore was required to comply with applicable

provisions of the TILA and Regulation Z, and the ECOA and Regulation B.

## VIOLATIONS

## MISREPRESENTATIONS

10. Plaintiff incorporates by reference all the foregoing paragraphs.

11. In credit advertisements and in course and conduct of offering and extending

credit, Countrywide represented expressly or by implication, that:

    A.    The Hardy's would save money when consolidating existing debts

            into a home equity loan with Countrywide.

    B.    The examples and illustrations advertised by Countrywide accurately

            illustrated the potential savings and benefits of consolidating existing

            credit cards balances and other loans into a loan with Countrywide.

However, Countrywide's representation, as alleged, was false or

misleading.

12. Countrywide's practices constitute deceptive acts or practices in or affecting

Commerce in violation of section 5(a) of the Federal Trade Commission Act,
15 U.S.C. § 45(a).

13. On the Hardy's Hud 1 (Settlement) statement Countrywide incorporated
Excessive fees (ex. EPA Endorsement fee = $95.00) (e-mail fee = $35.00)
Excessive late fees attached = $83.23 during loan transfers. Several payments
Are not showing on ledgers.

14. Inflated appraisals used to justify loan. Income inflated to push loan thru.

15. Loan application completed by Mortgage Broker.

16. Rescission notices not given to Mrs. Hardy, even though she was a signer on
the loan.

17. Loan papers were not given to Mr. Hardy or Mrs. Hardy prior to closing for
their viewing.

18. Closing was rushed, and took place in the Hardy's home rather than in a
closing attorney's office.

In the course and conduct of offering and extending credit, these defendants in many
instances violated the requirements of TILA and Regulation Z in the following respects:
In connection with the Homeowner's right to receive disclosure in violation of section
128 of the TILA, 15 U.S.C. § 1638, and Section 226.17 of Regulation Z, 12 C.F.R. §
226.239(c); (loan splitting practices.)

19. Property Taxes that were to be paid to Cook County Illinois by Countrywide
(Although paid in monthly payments by Mr. Hardy) were not paid and
therefore, the Hardy home is being sold for taxes.

20. The Hardy's have requested proof of the actual note holder, but have not received a reply. The Hardy's are asking for the original note or a true affidavit from an officer of the corporation showing true standing.

## INJURY

The Hardy's have suffered, and will continue to suffer, substantial injury as a result of the defendants' violations of § 5 (a) of the FTC Act, the TILA, the ECOA, and the FCRA, as set above.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 108(c) of the TILA, 15 U.S.C. § 1607(c), Section 704 of the ECOA, 15 U.S.C. § 1691c, Section 621 of the FCRA, 15 U.S.C. § 1681s, and pursuant to its own equitable powers.

(a)    Enter judgment against defendants and in favor of plaintiffs for each Violation charged in the complaint;

(b)    Permanently enjoin and restrain defendants from violating § TILA, Regulation Z, and RESPA in any way where the Hardy's are concerned.

(c)    Find the defendants jointly and severally liable for redress to the Hardy's Who have been injured as a result of the defendants' violations of 5(a) of? The FTC Act, the TILA and Regulation Z, the ECOA's Regulation B, and The FCRA;

(d)    Award such relief as the Court deems necessary to prevent unjust

Enrichment and to redress borrower injury resulting from defendants'

Violations of § 5(a) of the FTC Act, the TILA and Regulation Z, the

ECOA's Regulation B, and the FCRA, including, but not limited to

Rescission or reformation of contracts, the refund of monies paid,

And disgorgement of ill-gotten gains; and

(e)    Award plaintiff its cost of  bringing  this action, as well as such other

Additional equitable relief as the Court determines to be just and proper.

Dated: 08/07/08

Respectfully Submitted,

Philanders Hardy
Pro Se

*Exhibit "A"*

# TRUTH-LENDING DISCLOSURE STATEMENT

## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Applicants: **PHILANDERS HARDY**

Property Address: **7896 SOUTH LUELLA AVENUE**
**Chicago, IL 60649**

Application No: **206070706**

Prepared By: **AMTEC FUNDING GROUP LLC**
**12463 BEL RED RD#250**
**Bellevue, WA 98005**
**800-779-1020**

Date Prepared: **07/06/2006**

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after making all payments as scheduled |
| * 8.942 % | $ * 330,553.08 | $ * 175,660.00 | $ * 506,213.08 |

☐ REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit
PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payments ** | When Payments Are Due | Number of Payments | Amount of Payments ** | When Payments Are Due | Number of Payments | Amount of Payments ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 359 | 1,406.13 | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 1 | 1,412.41 | | | | | | | |

☑ DEMAND FEATURE: This obligation has a demand feature.
☐ VARIABLE RATE FEATURE: This loan contains a variable rate feature. A variable rate disclosure has been provided earlier.

CREDIT LIFE/CREDIT DISABILITY: Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type | Premium | Signature |
|---|---|---|
| Credit Life | | I want credit life insurance.    Signature: |
| Credit Disability | | I want credit disability insurance.    Signature: |
| Credit Life and Disability | | I want credit life and disability insurance.    Signature: |

INSURANCE: The following insurance is required to obtain credit:
☐ Credit life insurance  ☐ Credit disability  ☑ Property insurance  ☐ Flood insurance
You may obtain the insurance from anyone you want that is acceptable to creditor
☐ If you purchase  ☐ property  ☐ flood insurance from creditor you will pay $               for a one year term.
SECURITY: You are giving a security interest in:
☐ The goods or property being purchased  ☑ Real property you already own.
FILING FEES: $ **25.00**
LATE CHARGE: If a payment is more than   **15** days late, you will be charged   **5.000** % of the payment
PREPAYMENT: If you pay off early, you
☑ may  ☐ will not   have to pay a penalty.
☐ may  ☑ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
☐ may  ☑ may, subject to conditions  ☐ may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
☑ * means an estimate          ☑ all dates and numerical disclosures except the late payment disclosures are estimates.

**CLOSING INSTRUCTIONS**

LOAN #: 168607026

Prepared by: SUSAN CHOU
Date and Time: 05/18/2007
          19:42:53

| | |
|---|---|
| **Settlement Agent:**<br>REAL SOURCE TITLE | **Lender:**<br>COUNTRYWIDE HOME LOANS, INC. |
| **Address:**<br>151 N MICHIGAN AVE STE 721<br>CHICAGO, IL 60601 | **Address:**<br>Branch #: 0006089<br>939 NORTH AVENUE STE 680<br>CHICAGO, IL 60622 |
| **Attn:**<br>JACQUELYN HATHAWAY<br>**File No.** | **Attn:** |
| **Phone No.**<br>(312)217-727<br>**Fax No.** | **Loan No.**<br>168607026<br>**Phone No.**<br>(312)274-5600<br>**Fax No.**<br>(312)787-9572 |

**Borrower:**
PHILANDERS HARDY

**Seller:**
Refinance

**Loan Type:**
SUBPRIME    R/C

**Lien Position:**
FIRST

**Property Address:**
7806 S LUELLA AVE
CHICAGO, IL 60649-5009

**Initial Payment (excluding impounds):**
1,488.93

**Loan Term (months):**
360

**Initial Interest Rate:**
7.875

**First Payment Date:**
JULY 01, 2007

**Maximum Principal Balance:**
0.00

**Sales Price:**
N/A

**Loan Amount:**
205,350.00

**Draw Amount (HELOC and Construction Only):**
0.00

**Anticipated Closing Date:**
05/21/2007

**Anticipated Funding Date:**
05/25/2007

☐ **ARM Loan:**
   **Index:**
   **Margin:**
   **Periodic Cap:**
   **Ceiling:**                     0.000
   **Floor:**
   **Interest Rate Change Date:**
   **Payment Change Date:**

☐ **Buydown Loan:**

**Wiring Instructions (except for any portion of an unwanted HELOC draw):**
The Bank of New York
48 Wall Street
New York, NY
ABA# 021000018
Countrywide Home Loans
Acct# 8900215224
Reference: 168607026

• Closing Instructions
1C086-US (11/06)(d/i)

Page 1 of 23



| NAME AND ADDRESS OF BORROWER: | NAME AND ADDRESS OF LENDER: |
|---|---|
| Philanders Hardy<br>Tracy Hardy | Countrywide Home Loans, Inc.<br>939 North Avenue - Suite 680<br>Chicago, IL 60622 |

| PROPERTY LOCATION: | |
|---|---|
| 7806 South Luella Avenue<br>Chicago, IL 60649<br>Cook County, Illinois | **SETTLEMENT AGENT:** Real Source Title, LLC |
| | **PLACE OF SETTLEMENT:** 151 N. Michigan Ave #721<br>Chicago, IL 60601 |
| | **SETTLEMENT DATE:** May 21, 2007       Disburse:05/25/07 |
| | **LOAN NUMBER:** 168607026 |

## L. SETTLEMENT CHARGES

| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | | M. DISBURSEMENT TO OTHERS | | |
|---|---|---|---|---|---|
| 801. Loan Origination Fee          % to | | | 1501. Payoff 1st Mortgage    to | | |
| 802. Loan Discount    3.0000 % to Countrywide Home Loans, Inc. | | | HomEq Servicing | | 193,885.69 |
| 803. Appraisal Fee          to LandSafe Appraisal | | 6,160.50 | 1502. Est'd 1st half taxes due    to | | |
| 804. Credit Report          to LandSafe Credit | | 305.00 | Cook County Treasurer | | 606.26 |
| 805. Lender's Inspection Fee          to | | 35.00 | 1503. | | |
| 806. Mortgage Ins. App. Fee          to | | | | | |
| 807. Lender Fee          to Countrywide Homes Loans, Inc. | | | 1504. | | |
| 808. Tax Service Fee          to Countrywide Tax Service Corp. | | 775.00 | | | |
| 809. Flood Check Fee          to LandSafe Flood Determination, Inc | | 90.00 | 1505. | | |
| 810. | | 26.00 | | | |
| 811. | | | 1506. | | |
| 812. | | | | | |
| 813. | | | 1507. | | |
| 814. | | | | | |
| 815. | | | 1508. | | |
| 816. | | | | | |
| 817. | | | 1509. | | |
| 818. | | | | | |
| 819. | | | 1510. | | |
| 820. | | | | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | 1511. | | |
| 901. Interest 05/25/07 to 06/01/07 @ $    44.300000/day | | | | | |
| 902. Mortgage Insurance Prem for    months to | | 310.10 | 1512. | | |
| 903. Hazard Insurance Prem for    1.0 yr to | | | | | |
| 904. | | | 1513. | | |
| 905. | | | | | |
| 1000. RESERVES DEPOSITED WITH LENDER | | | 1514. | | |
| 1001. Hazard Insurance    2.000 months @ $    89.03 per month | | 178.06 | | | |
| 1002. Mortgage Insurance    months @ $    per month | | | 1520. TOTAL DISBURSED | | |
| 1003. City/Town Taxes    months @ $    per month | | | (enter on line 1603) | | 194,491.95 |
| 1004. County Taxes    6.000 months @ $    120.32 per month | | 721.92 | | | |
| 1005. Assessments    months @ $    per month | | | | | |
| 1006.    months @ $    per month | | | | | |
| 1007.    months @ $    per month | | | | | |
| 1008. Aggregate Escrow Ad    months @ $    per month | | -178.16 | | | |
| 1100. TITLE CHARGES | | | | | |
| 1101. Closing Fee          to Real Source Title, LLC | | 375.00 | | | |
| 1102. Title Search          to | | | | | |
| 1103. Title Examination          to | | | | | |
| 1104. Title Ins. Binder          to | | | | | |
| 1105. Email Fee          to Real Source Title Recording | | 35.00 | | | |
| 1106. EPA Endorsement          to Real Source Title, LLC | | 95.00 | | | |
| 1107. Package Processing Fee          to Real Source Title Recording | | 35.00 | | | |
| (includes above item numbers:                    ) | | | | | |
| 1108. Title Insurance          to Real Source Title, LLC | | 567.00 | | | |
| (includes above item numbers:                    ) | | | | | |
| 1109. Lender's Coverage  $    205,350.00 | | | | | |
| 1110. Owner's Coverage  $ | | | | | |
| 1111. | | | | | |
| 1112.          Anchor Bank | | | | | |
| 1112 State of IL Policy Fee          to Real Source Title, LLC | | | **N.   NET SETTLEMENT** | | |
| 1114. | | 3.00 | | | |
| 1115. | | | | | |
| 1116. | | | 1600.  Loan Amount | $ | 205,350.00 |
| 1117. | | | | | |
| 1118. | | | | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | 1601.  Plus Cash/Check from<br>Borrower | $ | 0.00 |
| 1201. Recording fees: Mortgage $          : Releases $ | | | | | |
| 1202. City/County Tax/Stamps:  Mortgage    $ | | | 1602.  Minus Total Settlement<br>Charges (line 1400) | $ | 9,533.42 |
| 1203. State Tax:Stamps:  Mortgage    $ | | | | | |
| 1204.          Recording | | | | | |
| 1205. Conservation Fee    Recording | | | 1603.  Minus Total Disbursements<br>to Others (line 1520) | $ | 194,491.95 |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | | | |
| 1301. Survey | | | | | |
| 1302. Pest Inspection | | | 1604. Equals Disbursements to | | |
| 1303. | | | | | |

# The Subprime Credit Crisis of 07

September 12, 2007

Revised May 11, 2008

## Michel Crouhy[*] and Stuart M. Turnbull[**]

**\* Natixis**

Head of Research & Development

+33 (0)1 58 55 20 58

Email:

**\*\*Bauer College of Business**

University of Houston

713-743-4767

Email:

**JEL Classification:** G22, G30, G32, G38

**Keywords:** Subprime mortgages, SIVs, monolines, transparency, valuation.

[1] Comments from Steve Arbogast, William Dellal, Darrell Duffie, Tom George, Rajna Gibson, Dan Jones, Arthur Maghakian and Lee Wakeman are gratefully acknowledged.

Electronic copy available at: http://ssrn.com/abstract=1112467

## Abstract

This paper examines the different factors that have contributed to the subprime mortgage credit crisis: the search for yield enhancement, agency problems, lax underwriting standards, failure by the rating agencies to identify a changing environment, poor risk management by financial institutions, lack of transparency, the limitation of extant valuation models and the failure of regulators to understand the implications of the changing environment for the financial system. The paper addresses the different issues and offers suggestions on how to move forward.

Credit Crisis

2

Electronic copy available at: http://ssrn.com/abstract=1112467

## Introduction

The credit crisis of 2007 started in the subprime[1] mortgage market in the U.S. It has affected investors in North America, Europe, Australia and Asia and it is feared that write-offs of losses on securities linked to U.S. subprime mortgages and, by contagion, other segments of the credit markets, could reach a trillion US dollars.[2] It has brought the asset backed commercial paper market to a halt, hedge funds have halted redemptions, or have failed, and special investment vehicles have been wound-down. Banks have suffered liquidity problems, with losses since the start of 2007 at leading banks and brokerage houses topping US$250 billion, as of April 2008.[3,4] Financial institutions are expected to write off an additional US$80 billion in the first quarter of 2008. Credit related problems have forced some banks in Germany to fail or to be taken over and Britain had its first bank run in 140 years, resulting in the nationalizing of the troubled mortgage lender. The U.S. Treasury and Federal Reserve helped to broker the rescue of Bear Stearns, the fifth Wall Street investment bank, by JP Morgan Chase during the week-end of March 17, 2008.[5] Banks, concerned about the magnitude of future write downs and counterparty risk, have been trying to keep as much cash as possible as a cushion against potential losses. They have been wary of lending to one another and consequently, have been charging each other much higher interest rates than normal in the inter bank loan markets.[6]

---

[1] The term "subprime" refers to mortgagees who are unable to qualify for prime mortgage rates. Reasons for this include poor credit histories (payment delinquencies, charge offs, bankruptcies, low credit scores, large exiting liabilities, high loan to value ratios).

[2] In April 2008, the International Monetary Fund (IMF) said that total financial losses stemming from the housing turmoil and the global credit crunch, including the securities tied to commercial real estate and loans to consumers and corporates, may reach US$945 billion over the next two years, with US$565 billion directly related to the subprime crisis. And losses at financial institutions are likely to be saddled with half the potential losses, or about US$440 to US$510 billion. .

[3] The US$250 billion in losses related to the subprime crisis compares to about US$170 billion in losses for the savings and loan crisis in the 1980s and early 1990s.

[4] Appendix 1 shows the credit losses and subprime related write-downs since the beginning of 2007 at major banks worldwide, dased on data compiled by Bloomberg. Early 2008, AIG's auditors forced the insurer to lower the value of credit-default swaps it holds by an estimated amount of US$4.88 billion. Credit Suisse announced in February that it had to write-down US$2.85 billion of previously mismarked structured credit products

[5] To smooth the deal, the Fed has taken the unprecedented step of providing US$30 billion in financing for Bear's less liquid assets. The Fed is assuming responsibility for managing the assets and assumes the risk of those assets declining in value, except for the first billion which will have to be absorbed by JP Morgan Chase, and the profit if they rise in value.

[6] These rates, in turn, affect monthly payments on millions of credit cards and mortgages in Europe and the U.S.

Credit Crisis

3

The severity of the crisis on bank capital has been such that U.S. banks have had to cut dividends and call global investors, such as sovereign funds, for capital infusions of more than US$230 billion, as of May 2008, based on data compiled by Bloomberg.[7] The credit crisis has caused the risk premium for some financial institutions to increase eightfold since last summer and is higher than the cost of raising cash for non-financial firms with the same credit rating.[8]

The effects of the crisis have affected the general economy. For example, credit conditions have tightened for all types of loans since the subprime crisis started nearly a year ago. The biggest danger to the economy is that, to preserve their regulatory capital ratios, banks will cut off the flow of credit, causing a decline in lending to companies and consumers. According to some economists, tighter credit conditions could directly subtract 1 ¼ percentage point from first-quarter growth in the U.S. and 2 ½ points from the second-quarter growth. The Fed lowered its benchmark interest rate 3.25 percentage points to 2 percent between August 2007 and May 2008 in order to address the risk of a deep recession. The Fed has also been offering ready sources of liquidity for financial institutions, including investment banks and primary dealers, that are finding it progressively harder to obtain funding, and has taken on mortgage debt as collateral for cash loans.

The deepening crisis in the subprime mortgage market has affected investor confidence in multiple segments of the credit market, with problems for commercial mortgages unrelated to subprime, corporate credit markets,[9] leverage buy-out loans (LBOs),[10] auction-rate securities, and parts of consumer credit, such as credit cards and car loans. In January 2008, the cost of insuring

---

[7] As an alternative to raise more capital banks are trying to shrink their balance sheet by selling loans at a discount. Citigroup is negotiating (April 10, 2008) with a group of leading private equity firms (Appolo, Blackstone and TPG) the sale of US$12 billion in leverage loans at a discount that could come in at about 90 cents on the dollar. Anxiety is such that even some dedicated free-market spirits, such as Nobel laureate Myron Scholes, declared to the French newspaper, La Tribune (January 24th, 2008) that a concerted political effort has become necessary. In addition to sovereign funds, the U.S. government may have to step in to recapitalize some of the large financial institutions subject to large losses to ensure that they can keep financing the economy.

[8] For example, funding for Citigroup, one of the hardest hit by the credit crisis, has risen from 12 bps to 1 percentage point over Libor, while the cost of borrowing for Merrill Lynch has climbed from to 1.50 percentage point over Libor from 20 bps. Investors believe there is an increasing probability of default for banks. The iTraxx Senior Financial Index that tracks the cost of insuring the senior debt of a portfolio of 25 European banks and insurers has increased from 8 bps to 57 bps.

[9] The credit crisis has caused credits spreads to increase, especially for junk bonds. Some highly levered companies have been forced to postpone new debt issues.

[10] The leverage loan market in February 2008 is starting to show sighs of weakness as UBS and Credit Suisse announced the write down of a combined US$400 million in the value of leveraged loans as part of their fourth-quarter 2007 earnings report. Some analysts expect as much as US$15 billion in leveraged-loan related write-downs at commercial and investment banks in the first quarter of 2008.

Credit Crisis

4

against default by European speculative bonds had risen by almost one-and-a-half percentage point over the previous month, from 340 bps to 490 bps[11], while the U.S. high-yield bond spread has reached 700 bps over Treasuries, from 600 bps at the start of the year.[12]

This paper examines the different factors that have contributed to this crisis and offers some suggestions about how to avoid a repeat. In Section 2, we briefly analyze the chain of events and major structural changes that affected both capital markets and financial institutions that contributed to this crisis. The players and issues at the heart of the current subprime crisis are analyzed in Section 3. In Section 4, we outline a number of solutions that would reduce the possibility of a repeat, and a summary is given in Section 5.

## Section 2: How It All Started [13]

Interest rates have been relatively low for the first part of the decade.[14] This low interest rate environment has spurred increases in mortgage financing and substantial increases in house prices.[15] It encouraged investors to seek instruments that offer yield enhancement. Subprime mortgages offer higher yields than standard mortgages and consequently have been in demand for securitization. The demand for increasingly complex structured products such as collateralized debt obligations (CDOs) which embed leverage within their structure exposed investors to greater risk of default, though with relatively low interest rates and rising house prices, this risk was not viewed as excessive.

---

[11] Cf. iTraxx Europe crossover index. It closed at 510 bps on February 6, which means that the annual cost of insuring 10 million euros worth of high-yield debt against default over 5 years is 510,000 euros. In the U.S., the HiVol index of the 30 riskier investment grade credits of the 125 names composing the CDX index reached almost its peak on February 6, at 271 bps.

[12] According to a recent report by Altman and Karlin (2008) default rates were near-record low and recovery rates were near record high in 2007 for high-yield bonds. Default rates fell to just 51 bps, the lowest since 1981. According to S&P the default rate on leveraged loans decreased again in 2007 to just 26 bps, down from 1.1% in 2006 and 3% in 2005. Default losses on high yield bonds were just 20 bps in 2007 based on an average recovery rate of 67%. One measure of the potential increase in defaults going forward is the distress ratio, i.e., bonds yielding more than 10% above Treasuries. This ratio increased dramatically to 10.4% as of year-end 2007 from record low levels just six months earlier, and from 1.7% at the end of 2006. Altman forecast a default rate for high yield bonds of 4.6% in 2008 and 5% in 2009, a significant increase from the current default rate of 51 bps.

[13] Items have been drawn from many different sources: Business Week, Financial Times (London), New York Times, Wall Street Journal, Bloomberg and the Federal Reserve.

[14] The Fed funds rate was 1% in June 2003. It started to slowly increase in June 2004, and was 5.25% by June 2006. It was reduced to 4.75%, September 18, 2007.

[15] In the U. S. 50 million, or two-thirds of homeowners currently have mortgages, with 75.2% being financed with fixed rate mortgages and the remaining 24.8% with adjustable rate mortgages (ARMs). These figures come from the Mortgage Bankers Association, August 15, 2007.

Prior to 2005, subprime mortgage loans accounted for approximately 10% of outstanding mortgage loans. By 2006, subprime mortgages represented 13% of all outstanding mortgage loans with origination of subprime mortgages representing 20% of new residential mortgages compared to the historical average of approximately 8%.[16] Subprime borrowers typically pay 200 to 300 basis points above prevailing prime mortgage rates. Borrowers who have better credit scores than subprime borrowers but fail to provide sufficient documentation with respect to all sources of income and/or assets are eligible for Alt-A loans. In terms of credit risk, Alt-A borrowers fall between prime and subprime borrowers.[17]

During the same period, financial markets have been exceptionally liquid, which has fostered higher leverage and greater risk-taking. Spurred by improved risk management techniques and a shift by global banks towards the so-called "originate-to-distribute" business model, where banks extend loans but then distribute much of the underlying credit risk to end-investors, financial innovation has led to a dramatic growth in the market for credit risk transfer (CRT) instruments. Over the past four years the global amount outstanding of credit default swaps has multiplied more than tenfold,[18] and investors now have a much wider range of instruments at their disposal to price, repackage, and disperse credit risk throughout the financial system.

CDOs of subprime mortgages are the CRT instruments at the heart of the current credit crisis, as a massive amount of senior tranches of these securitization products have been downgraded from triple-A rating to non-investment grade. The reason for such an unprecedented drop in the rating of investment grade structured products is the significant increase in delinquency rates on subprime mortgages after mid-2005, especially on loans that were originated in 2005-2006.

The delinquency rate for conventional prime adjustable rate mortgages (ARMs) peaked in 2001 to about 4% and then slowly decreased until the end of 2004, when it started to increase again. It was still below 4% at the end of 2006. For conventional subprime ARMs, the peak occurred during the middle of 2002, reaching about 15%. It decreased until the middle of 2004 and then started to increase again to approximately 14% by the end of 2006, according to the

---

[16] Subprime loans grew from US$160 billion in 2001 (or 7.2% of new mortgages) to US$600 billion in 2006 (or 20.6% of new mortgages).

[17] For a comparison of prime and subprime mortgages, see Agarwal (2007)

[18] According to Bank for International Settlements (BIS) the notional amount outstanding of CDSs (Credit Default Swaps) was US$43 trillion by end of June 2007 while it was only US$14 trillion at the end of 2005. However, according to ISDA, the net exposure to the banking system is "only" US$1 trillion after netting.

Mortgage Bankers Association.[19] During 2006, 4.9% of current home owners (2.45 million) had subprime adjustable rate mortgages. For this group, 10.13% were classified as delinquent[20]; this translates to a quarter of a million home owners. At the end of 2006, the delinquency rate for prime fixed rate mortgages was 2.27% and 10.09% for subprime. [21]

There are four reasons why delinquencies on these loans rose significantly after mid-2005. First, subprime borrowers are typically not very creditworthy, often highly levered with high debt-to-income ratios, and the mortgages extended to them have relatively large loan-to-value ratios. Until recently, most borrowers were expected to make at least 20% down payment on the purchase price of their home. During 2005 and 2006 subprime borrowers were offered "80/20" mortgage products to finance 100% of their homes. This option allowed borrowers to take out two mortgages on their homes. In addition to a first mortgage for 80% of the total purchase price, a simultaneous second mortgage, or "piggyback" loan for the remaining 20% would be made to the borrower.

Second, in 2005 and 2006 the most common subprime loans were of the so called "short-reset" type. They were the "2/28"or "3/27" hybrid ARMs subprime for which the interest rate initially charged is much lower than standard mortgage rates, but after a two to three year period, it is typically reset to a much higher rate. These loans had a relatively low fixed teaser rate for the first two or three years, and then reset semiannually to an index plus a margin for the remaining period. A typical margin was 400 to 600 bps. Short-term interest rates began to increase in the U.S. from mid-2004 onwards. However, resets did not begin to translate into higher mortgage rates until sometime later. Debt service burdens for loans eventually increased, which led to financial distress for some of this group of borrowers. To make matters worse, US$500 billion in mortgages will reset in 2008.

Third, many subprime borrower had counted on being able to refinance or repay mortgages early through home sales and at the same time produce some equity cushion in a market where home prices kept rising. As the rate of U.S. house price appreciation began to decline after April 2005 the possibility to refinance early was pushed further into the future and

---

[19] Doms, Furlong and Krainer (2007) find a negative correlation between house prices appreciation and subprime delinquency rates. They also show that the rate of change in the price appreciation affects the delinquency rate.

[20] The Mortgage Bankers Association defines delinquent as having one or more payments over due.

[21] These figures are given in the press release of the Mortgage Bankers Association (March 13, 2007).

many subprime borrowers ended up incurring higher mortgage costs than they might have expected to bear at the time of taking their mortgage. [22]

Fourth, the availability of subprime mortgages was amplified by investor demand for higher yielding assets. A major contributor to the crisis was the huge demand by CDOs for BBB mortgage bonds which allowed substantial growth in home equity loans – otherwise, there would have been no "arbitrage" in structuring CDOs and therefore less issuance of mortgages. This boosted the demand for residential mortgage-backed securities (RMBS) and CDOs containing mortgage-backed securities (MBS) and CDO tranches, which offer higher returns compared to those available from corporate or sovereign credit. The supply of subprime assets adjusted to this higher demand aided by the application of excessive loose credit standards by mortgage originators.[23] Some mortgage borrowers have ended up with subprime mortgages, even though their credit worthiness qualifies them for lower risk types of mortgages, others ended with mortgages that they were not qualified to have.[24] The accuracy of information in mortgage applications slipped. It has also spurred an increase in illegal lending practices and massive fraud. [25] The results of these declining standards and dubious practices in underwriting over the

---

[22] The economy started to change during 2004. First, mortgage rates started to increase, as the Federal Reserve increased the Fed Funding rate and second, house price appreciation decelerated. There are many factors that cause delinquency in the mortgage markets, major candidates being: job loss, unanticipated medical expenses, divorce and rising mortgage expenses. House prices can also affect the default decision. If house prices are falling, this can affect this decision in two ways. First, it limits the ability to re-finance and second, it can cause the home owner's equity to become negative if the initial equity stake was small, as is often the case for subprime mortgages. Since the middle of 2005, the rate of house price appreciation has been continuously decreasing. There has been wide variation across the country, with California, Florida Michigan, Massachusetts and Rhode Island having price depreciation. Consequently, there has been wide variation in subprime delinquency rate across different metropolitan areas. (See the report from the Office of Federal Housing Enterprise Oversight – August 30, 2007)

[23] This phenomenon was exacerbated by the decline in subprime mortgage rates starting in 2004 due to increase price competition. This, along with the Federal Reserve increasing interest rates, reduced the profitability of lending. To offset this decrease, some originators reduced standards – see Coy (2007). Evidence of loosening underwriting standards was first noted in 2005 in the Office of the Comptroller of the Currency's annual survey of underwriting practices at national chartered banks.

[24] See Morgenson (2007).

[25] Lenders were far too willing to lend as evidenced by the creation of new types of mortgages, known as "affordability products" that required little or no down payment, and little or no documentation of a borrower's income, the last ones being known as "liar loans". Liar loans accounted for 40 percent of the subprime mortgage issuance in 2006, up from 25 percent in 2001. The Federal Reserve issued three cease and desist orders due to mortgage related issues in the last four years: Citigroup Inc. and CitiFinancial Credit Company (May 27, 2004); Doral Financial Corporation (June 16, 2006); R&G Financial Corporation (June 16, 2006). Ameriquest Mortgage Company (Aegis Mortgage Corporate and associated companies) set up a US$295 million Settlement Fund to compensate borrowers for unlawful mortgage lending practices.

last three years have manifested themselves in greatly increased delinquency rates for mortgages originated during 2005 and 2006.

## Section 3: Players and Issues at the Heart of the Crisis

In this section, we identify the different players in the crisis and briefly describe the events that have unfolded since 2005-2006. We start with the role of the rating agencies, as the issue of timely and accurate credit ratings have been central to the crisis. Then, we turn to the role of the mortgage brokers and lenders. We then describe the types of vehicles that have been at the center of the storm. We also discuss how central banks reacted to the current crisis. We then address the issues of valuation and transparency that have been catalysts for the crisis. The situation of the monolines is discussed next and we end this section explaining why systemic risk occurred.

### 3.1 Rating Agencies[26]

Rating agencies are at the center of the current crisis as many investors relied on their ratings for many diverse products: mortgage bonds, asset back commercial paper (ABCP) issued by the structured investment vehicles (SIVs), and monolines which insure municipal bonds and structured credit products such as tranches of CDOs.[27] Investors in complex credit products had considerably less information at their disposal to assess the underlying credit quality of the assets they held in their portfolios than the originators. As a result, end-investors often came to rely heavily on the risk assessments of rating agencies.

Many investors, such as money market funds and pension funds, are restricted to investing only in triple-A assets and base their investment decision on the rating attributed by the

---

The Federal Bureau of Investigation is now looking at over 1,200 cases compared to 818 cases in 2006. Last year they obtained over 204 mortgage fraud convictions, generating US$388 million in restitution and US$231 million in fines – see Davies (2007).

The state of the subprime market also attracted attention to industry practices in mortgage origination. The declining underlying standards and fraud is noted by Cole (2007) and Bernanke (May 17, 2007). Morgenson (2007) identified some of the techniques used by lenders to increase subprime mortgages originations. These were often not in the best interest of the borrower.

[26] Some of the material in this section draws from the publicly available information supplied by Moody's, S&P and the testimonies given by Michael Kanef, Managing Director, Moody's Investors Services (2007) and Vickie Tillman, Executive Vice President of S&P (2007).

[27] Rating agencies earn hefty fees for rating structured credit securities. In 2006, Moody's reported that 43 percent of total revenues came from rating structured notes.

rating agencies.[28] Implicitly in the investment decision is that ratings are timely and relatively stable. No one was expecting, until recently, a triple-A asset to be downgraded to junk status within a few weeks or even a few days.

The rating agencies started warning about the state of the residential housing market before the beginning of 2006. In the summer of 2006, warnings were issued about the deteriorating state of the subprime market. Moody's first took rating action on 2006 vintage subprime loans in November 2006. In February 2007, S&P took the unprecedented step of placing on "credit watch" transactions that had been closed as recently as the last year. Subsequent months saw all the agencies downgrade many securities and in many cases, the changes were large, from AAA to CCC, rising questions about the veracity of the rating methodologies employed by the different agencies. The rating agencies have come under criticism from media and with both the European Commission and Barney Frank, chair of the House Financial Services Committee, holding separate hearings on the agencies response to the subprime mortgage crisis, and possible conflicts of interest arising from (a) rating agencies being paid by issuers and (b) rating agencies offering advisory services to issuers.

Originators make loans and supposedly verify information provided by the borrowers. Issuers and arrangers of mortgage backed securities bundle the mortgages and perform due diligence. The rating agencies receive data from the issuers and arrangers and assume that appropriate due diligence has been performed. Rating agencies do not cross check the quality of borrowers' information provided by the originators. Typically, agencies use a large number of specific credit characteristics, such as income, net assets, credit history, and Fair Isaac and Company (FICO) scores. Many of these characteristics, for example, the borrower's income and house price, will vary over the life of a loan. The borrower's propensity to make mortgage payments and/or payoff credit cards will also vary over time.

The rating process proceeds in two phases. First, the estimation of the loss distribution over a specified horizon and, second, the simulation of the cash flows. The loss distribution allows the determination of the credit enhancement (CE), that is, the amount of loss on the underlying collateral that can be absorb before the tranche absorbs any loss. If the credit rating is associated with a probability of default, the amount of CE is simply the level of loss such that the

---

[28] Most of the US$2.5 trillion sitting in the money market funds is invested in such assets as U.S. Treasury bills, certificates of deposit and short-term commercial debt. In the recent low interest rate environment these funds have also invested in triple-A super-senior tranches of CDOs and triple-A rated ABCP, in order to increase the yield generated by these funds.

probability that the loss is higher than CE is equal to the probability of default. CE is thus equivalent to a Value-at-Risk type of risk measure. In a typical CDO, credit enhancement comes from two sources: "subordination", that is, the par value of the tranches with junior claims to the tranche being rated, and "excess spread" which is the difference between the income and expenses of the credit structure. Over time, the CE, in percentage of the principal outstanding, will increase as prepayments occur and senior securities are paid out. The lower the credit quality of the underlying subprime mortgages in the ABS CDOs, the greater will be credit enhancement, for a given credit rating. Deterioration of credit quality, will lead to a downgrade of the ABS structured credits.

As with the rating of corporate bonds, rating agencies seek to make the rating of subprime related structured credit stable through the housing cycle. Therefore, rating agencies must respond to shifts in the loss distribution during the housing cycle by increasing the amount of CE needed to keep the ratings constant as economic conditions deteriorate, or by downgrading the structured credit. The contrary happens when the housing market improves.[29]  What was not anticipated by investors is the volatility of the rating changes that would follow as the housing market started to deteriorate, with ratings that unexpectedly dropped from triple-A to junk or, in some cases, to default within a few days as default correlations among borrowers became close to one..

During the end of 2006, Moody's warned that the percentage of subprime mortgages with full documentation was decreasing. At the beginning of the year, S&P also warned about the deteriorating conditions in the subprime market, with downgrades in the subprime residential mortgage market more than double the number of upgrades.

During the second week of July 2007, S&P downgraded US$7.3 billion of securities sold in 2005 and 2006. A few weeks later, Moody's Investor Service slashes ratings on 691 securities from 2006, originally worth US$19.4 billion.  Some 78 of the bonds had Moody's top rating of Aaa. The securities were backed by second lien mortgages that included piggyback mortgages. Moody's stated that the cause for the downgrades was the dramatically poor overall performance of such loans and rising default rates.  Fitch also downgraded subprime bonds sold by Barclays, Merrill Lynch and Credit Suisse.  In October, S&P lowered the ratings on residential mortgaged backed securities with a par value of US$22 billion. In November, Moody's downgraded 16

---

[29] This pro-cyclicality in CE has the potential to amplify the housing cycle. See Ashcraft and Schuermann (2007).

special investment vehicles with approximately US$33 billion in debt and in December another US$14 billion was downgraded with US$105 billion under review.

## 3.2 Mortgage Brokers and Lenders

Originating brokers had little incentive to perform their due diligence and monitor borrowers' credit worthiness, as most of the subprime loans originated by brokers were subsequently securitized. This phenomenon was aggravated by the incentive compensation system for brokers, based on the volume of loans originated, with no negative consequences for the brokers if the loan defaulted within a short period of time.[30]

Distress among subprime mortgage lenders was visible during 2006. The problem appeared when the Fed started to raise interest rates and less people could afford to borrow and pay interest on their loans.. At the end of the year, Ownit Mortgage Solutions Inc. ranked as the 11 largest issuer of subprime mortgages closed its doors. This was perhaps surprising, given that Merrill Lynch & Co had purchased a minority stake in Ownit the previous year. In the first quarter of 2007, New Century, ranked as the number two lender in the subprime market, also closed its doors. Others also failed or left the business.

Problems with mortgage lenders spread from the subprime to other parts of the mortgage market, as concerns about collateral values increased. The share price of Thornburg Mortgage Inc., which specializes in large (jumbo) prime home loans, dropped 47% after it stated that it was delaying its second quarter dividend and was receiving margin calls from creditors, due to the declining value of mortgages used as collateral. National City Home Equity Corp., the wholesale broker equity lending unit of National City Corp. announced that in response to market conditions, it has suspended approvals of new home equity loans and lines of credit. Aegis Mortgage Corp. (Houston) announced it is unable to meet current loan commitments and stopped taking mortgage applications. Other institutions also withdrew from the subprime and Alt-A markets. Alt-A originators, such as American Home Mortgage, filed for bankruptcy.

---

[30] To some extent this should have been mitigated by originators having to repurchase delinquent loans within a few months of origination ("early payment default" clause) . However, as some of the brokers were experiencing financial difficulties and even in some cases filed for bankruptcy, this did not occur, leading to even greater losses on the underlying asset pools. For example, Merrill Lynch demanded in December 2006 that ResMae mortgage Corp. which sold it US$3.5 billion in subprime mortgages, buy back US$308 million of loans where the borrowers had defaulted. ResMae said that those demands "crippled" its operations, in its filing for bankruptcy protection in February 2007. Accredited Home Lenders Holding reported a loss of US$37.8 million due to repurchase of bad loans (February, 2007).

Small mortgage brokers were being hurt in a number of different ways. GMAC LLC announced that it was tightening its lending terms. It would not provide warehouse funding for subprime loans and mortgages for borrowers who did not verify their income or assets. Many small lenders use short term warehouse loans that allow them to fund mortgages until they can be sold to investors. The inability to warehouse reduces the availability of credit.

Originators also spent funds persuading legislators to reduce tough new laws restricting lending to borrowers with spotty credits. Simpson (2007) reports that Ameriquest Mortgage Co., that was one of the nation's largest subprime lenders, spent over US$20 million in political donations. Citigroup Inc., Wells Fargo & Co. Countrywide Financial Corp. and the Mortgage Bankers Association also spent heavily on lobbying and political giving. These donation played a major role in persuading legislators in New Jersey and Georgia to relax tough predatory-lending laws passed earlier that might have contained some of the damage.[31]

## 3.3     Special Investment Vehicles [32]

A special, or structured, investment vehicle (SIV) is a limited purpose, bankrupt remote, company that purchases mainly highly rated medium and long term assets and funds these purchases with short term asset backed commercial paper (ABCP), medium term notes (MTNs) and capital. Capital is usually in the form of subordinated debt, sometimes tranched and often rated. Some SIVs are sponsored by financial institutions that have an incentive to create off balance sheet structures that facilitate the transfer of assets off their balance sheet and generate products that can be sold to investors. The aim is to generate a spread between the yield on the asset portfolio and the cost of funding by managing the credit, market and liquidity risks.

General descriptions of the methodologies employed for SIVs by the agencies are publicly available on their web sites. The basic approach is to determine whether the senior debt of the vehicle will retain the highest level of credit worthiness, (for example, AAA/A-1+ rating) until the vehicle is wind-down for any reason. The level of capital is set to achieve this AAA type of rating, with capital being used to make up possible short falls. The vehicle is designed with the intent to repay senior liabilities, or at least with an AAA level of certainty, before the

---

[31] In June 2004, New Jersey's Assembly and Senate uninanimously passed bills that rolled back parts of the earlier law, including the "tangible-net-benefit rule" that required lenders to prove that a refinancing of any home loan less than five years old would provide a "tangible-net-benefit" to the borrower. Thousand of New Jersey homeowners subsequently refinanced existing mortgages or took new loans with Ameriquest before the subprime market tanked. Many of these loans are now in foreclosure.

[32] This section draws on material given in Polizu (2006).

vehicle ceases to exist. If a trigger event occurs and the SIV is wind-down by its manger (defeasance) or the trustee (enforcement), the portfolio is gradually liquidated. Wind-down occurs if the resources are becoming insufficient to repay senior debt. No debt will be further rolled over or issued and the cash generated by the sale of assets is used to payoff senior liabilities.

The risks that a SIV has to manage to retain its AAA rating include credit, market, liquidity, interest rate and foreign currency, and managerial and operational risk. Credit risk addresses the credit worthiness of each obligor and the risk during the wind-down period when the SIV assets have suffered credit deterioration. For market risk, the manager is required on a regular basis to mark-to-market the assets of the portfolio and for illiquid assets, mark-to-model. When a SIV is forced to sell assets under unfavorable conditions, this will in general affect the value of all its assets. The manager's ability to address this type of situation is assessed. Liquidity risk arises because of (a) the need of refinancing due to the maturity mismatch between assets and liabilities; and (b) some of the portfolio's assets will require due diligence by potential investors and this will increase the length of the sale period. The SIV must demonstrate that apart from the vehicle's cash flows that provide liquidity, it has backstop lines of credit from different institutions, and highly liquid assets that can be quickly sold, so that it is able to deal with market disruptions. In a SIV, the liabilities are rolled over, provided that defeasance[33] has not occurred. In theory, a SIV could continue indefinitely.[34]

According to Moody's (September 5, 2007), there were some 30 SIVs and the total volume under management of SIVs and SIV-Lites had nominal values of approximately US$400 billion and US$12 billion respectively at the end of August 2007. The weighted average life of the asset portfolios in these vehicles is in the 3-4 year range.

---

[33] The defeasance mode is the orderly wind-down by the manager of the portfolio. The enforcement mode occurs if the trustee undertakes the wind-down.

[34]   Capital notes are subordinated to senior creditors and rank pari passu with all other capital notes outstanding. Capital notes typically have a fixed maturity date. Each year the maturity is automatically extended for a further year, unless the investor stops the automatic extension. This mechanism is termed the "rolling capital notes". Capital notes usually receive some minimum rate, payable at pre-specified dates. The intention of the manager is to create excess spread above this minimum rate. Profits are shared between the manager (performance fees) and the investor (known as an additional interest amount). Leverage for a SIV is defined as the ratio of senior debt (ABCP plus MTNs) to capital notes. Typical leverage varies in the 12-14 range.
   A variant of a SIV is the SIV-Lite structure. In these types of vehicles, capital has a finite maturity. The vehicles typically hold residential mortgage backed securities and home equity backed securities. The fixed maturity implies that at launch, the maximum permitted leverage is fixed through the life of the vehicle. This is not the case with a SIV.

The SIVs relied on being able to continuously roll over their short-term funding and, even though they were "bankruptcy remote" from their sponsors, those that were unable to achieve this were able to turn to their sponsoring banks which had undertaken to provide them with backstop liquidity via credit lines in such situations. In fact these SIVs, akin to "unregulated banks" funding long-term assets with short-term funding resources, have been a contributor to the current credit crisis as they didn't have in place appropriate liquidity backup plans.

As the credit crisis intensified and the mortgage-backed securities held by the SIVs suddenly started to decline in value, some of the ABCP were downgraded, sometimes all the way to default within a few days. An increasing number of SIVs became unable to roll their ABCP and turned to their sponsor banks for rescue. HSBC was the first bank (November 28, 2007) to transfer US$45 billion of assets on to its balance sheet. Other banks soon followed: Standard Chartered took (December 5, 2007) US$1.7 billion, Rabobank (December 6, 2007) took US$7.6 billion, and Citigroup (December 14, 2007) US$49 billion. This is not a complete listing. Société Générale bailed out its investment vehicle with a US$4.3 billion line of credit (December 11, 2007).

The plight of SIVs continues. In February 2008, Citigroup announced that it plans to provide a US$3.5 billion facility to support six of the seven SIVs it took onto its balance sheet to shore up their debt rating and protect creditors. Also in February, Standard Chartered faced the prospect of a fire sale at its US$7.1 billion Whistlejacket SIV. The value of the assets had fallen to less than half of the amount of start-up capital which is a trigger for calling in receivers. More recently (February 21, 2008) Dresdner Bank announced that it is providing a backstop facility of at least US$17 billion on senior debt for its US$19 billion K2 SIV, to avoid a forced sale of its assets.[35]

## 3.4    The Economy and Central Banks

At the end of spring 2007, Ben Bernanke, Chairman of the Federal Reserve, stated (May 17, 2007), "We do not expect significant spillovers from the subprime market to the rest of the economy or the financial system." At the start of August, the European Central Bank injected 95 billion euro (US$131 billion) and informed banks that they could borrow as much money as they wanted at the bank's current 4% base rate without limit. The Bank of Canada issued a statement

---

[35] In the case of K2, Dresdner does not anticipate to make substantial losses as its assets are entirely investment grade and do not contain any exposure to subprime mortgages and related structured credit products.

that it pledges to "provide liquidity to support the Canadian financial system and the continued functioning of financial markets." Table 1 summarizes the actions of central banks.

In the second week of August, the Fed reported that the total commercial paper (CP) outstanding fell more than US$90 billion to US$2.13 trillion over the last week. Traditionally, prime corporate names used the CP market to finance short term cash needs. However, the low levels of interest rates during the past few years has meant that many of these issuers moved away from the CP market and issued low cost debt with maturities ranging from 5 to 10 years. The current lack of demand for CP made it very difficult for borrowers to rollover debt. William Poole, President of the St. Louis Federal Reserve publicly argued against a rate cut (August 16). The Fed took the unusual step of issuing a public statement that Mr. Poole's comments did not reflect Fed policy.

During the same week, a flight to quality occurred, with investors buying Treasuries. The yield on the three month T-bill fell from approximately 4% to as low as 3.4%. The FTSE 100 index declined by 4.1%, with financial companies being the hardest hit. Man Group fell 8.3% and Standard Chartered fell 7.6%. The Chicago Board Options Exchange Vix index, jumped above 37, its highest level in five years. It did ease back to 31. Unwinding of carry trades caused a sudden 2% increase in the yen/dollar exchange rate. Further unwinding occurred two days later, with hedge funds and institutional investors unwinding carry trades, causing the yen to increase 4% against the dollar, 5.3% against the euro, 5.8% against the pound, 10.3% against the New Zealand dollar and 11.5% against the Australian dollar.

Also during this period, the Fed injected US$5 billion into the money market through 14 day repurchase agreements and another US$12 billion through one day repurchase agreements.[36] The Russian Central Bank injected Rbs 43.1 billion (US$1.7 billion) into the banking system. Foreign investors had started to flee the ruble debt market, causing a liquidity squeeze. The European Central Bank has pumped money into Europe's overnight money markets. Fed has done similar in the US.

Four banks, Citigroup, JP Morgan, Bank of America and Wachovia, each borrowed US$500 million from the Fed. In a statement, JP Morgan, Bank of America and Wachovia, stated

---

[36] In the U. S. banks are required to have minimum level of reserves on average for a two week period, known as a "maintenance period." If a bank has excess reserves, it can lend then in the Fed funds market and if insufficient reserves, it can borrow in the Fed funds market. The Fed adds and drains credit from the market, so as to keep the effective Fed funds rate (the actual rate that banks borrow or lend) near to the target official Fed funds rate.

that they have substantial liquidity and have the capacity to borrow money elsewhere on more favorable terms. They were trying to encourage other banks to take advantage of the lower discount rate at the Fed window.

During the third week of August, the flight to quality continued. At the start of trading in New York, the yield on the 3 month T-bill was 3.90%, during the day, it fell to 2.51%, and by the end of day, it closed at 3.04%. However, other parts of fixed incomes markets continued to function, with investment grade companies issuing debt: Comcast Corp sold US$3 billion in notes; Bank of America sold US$1.5 billion in notes and Citigroup US$1 billion in notes. There was a rare high yield issuing by SABIC Innovative Plastics. It sold US$1.5 billion in senior unsecured notes.

The volatility in the foreign exchange market caused some hedge funds to close their yen carry trade positions. Between August 16-22, investors pour US$42 billion into money market funds. Institutional investors switch from commercial paper to Treasuries.

More recently, in April 2008, the Fed took the unprecedented measure of introducing a new lending facility, called the Primary Dealer Credit Facility (PDCF), for investment banks and securities dealers that give them the possibility to borrow against a wide range of securities as collateral for cash loans. Among other things the securities pledged by dealers must have market prices and "investment grade" credit ratings. [37]

## 3.5    Valuation Uncertainty

One of the critical issues driving the crisis has been the difficulty to value structured credit products.[38] In a fair value accounting framework[39] and with liquid markets, it is straightforward to value standardized instruments, though there are issues with non-standard instruments. In this framework, there are three levels used for classifying the type of fair valuation employed: Level 1 – clear market prices;[40] Level 2 -- valuation using prices of related instruments; and Level 3 – prices cannot be observed and model prices need to be used. For

---

[37] This facility was used the first time by Lehman in April 2008. Lehman shifted around US$2.8 billion in loans, including some risky LBOs it had been unable to sell, into a new investment vehicle it named "Freedom" which issued debt with 20% subordination that was assigned a single-A rating by rating agencies and therefore was eligible as collateral at the PDCF of the Fed.

[38] The decision to close one of the Synapse funds apparently arose due to the failure to reach agreement with its prime broker, Barclays Capital, about the valuation of assets held by the fund. The fund did not hold subprime mortgages. See Davies, Hughes and Tett (2007).

[39] See the Statement of Financial Accounting Standards, rules SFAS 157 and SFAS159.

[40] Price is defined as the amount that would be received to sell an asset or paid to transfer a liability.

example, valuation under Level 1 can be achieved for standard instruments such as credit default swaps for well known obligors. For a credit default swap with a non-standard maturity, then direct market prices can not be observed. Prices of credit swaps for the same obligor with standard maturities can be used to calibrate a valuation model to price the non-standard maturity. This would fall under Level 2 classification. There are many instruments that are non-standard and are illiquid, making valuation difficult. For such instruments, model valuation must be employed. This situation would fall under Level 3 classification. Faith in the reliability of these values is highest for Level 1 and lowest for Level 3, which is more subjective. There are numerous difficulties associated with implementing fair value accounting, event in liquid markets.[41] In the first quarter of 2008, level 3 assets have increased in U.S. banks. Goldman Sachs reported an increase of 40% of these assets to reach a total of US$96.4 billion of which US$25 billion are ABS. Level 3 assets are US$78.2 billion and US$42.5 billion for Morgan Stanley and Lehman Brothers, respectively.

Model prices are used for marking-to-model illiquid assets. For model estimation, prices of other liquid assets and time series data may be used. Inferring the parameters necessary to use the model becomes problematic in turbulent markets. This increases the uncertainty associated with the model prices. If markets are in turmoil, the number of instruments that can be valued under Level 1 decreases and the difficulties associated with implementation greatly increase. This increases the uncertainty associated with the valuation of instruments held in portfolios and this uncertainty feeds back into the market turmoil. Lenders want collateral for their loans, but turbulence in the markets increases the potential for disagreement between borrowers and lenders over the valuation of collateral. This can place borrowers in the position of being forced to sell assets, and in some cases cause funds to close, adding to the market turmoil.

One of the major issues in an illiquid market and one that has been repeatedly raised in the current crisis, is that due to the high degree of uncertainty, current prices for certain instruments are well below their 'true' values. Pricing assumptions that were reasonable a few months ago must be re-evaluated. In fair value accounting, the price of an instrument is what you would receive if sold. This implies that many institutions and funds have been forced to mark down their portfolios. For some funds, this has triggered automatic shut down clauses. In the case of the asset backed commercial paper market, it has brought the market to a close. Hedge funds borrow in the commercial paper market, pledging assets as collateral. Lenders look at the value of the pledged assets, which in many cases were related to the subprime market. Given the

---

[41] For a recent discussion and references to extant literature, see O'Brien (2005).

increasing levels of uncertainty associated with the valuation of assets, lenders refused to extend credit. This caused a major disruption to the asset backed commercial paper market and was one of the critical events in the crisis.

When financial institutions report their quarterly earnings, for Level 3 assets their valuation methodologies and associated inputs will in general differ. This is unavoidable given the use of models. Institutions know this and have incentives to pick their inputs to ensure that their results are "reasonable." Investors know that this game is going on, so even when quarterly results are published, uncertainty remains about the value of Level 3 assets.

The problems arising from the valuation of collateralized mortgage obligations containing subprime, and the rolling over of asset backed commercial paper came to a head during the summer. At the beginning of summer, two of Bear Stearns hedge funds, High Grade Structured Credit Strategies Master Fund and the High Grade Structured Credit Strategies Enhanced Leverage Master Fund, ran into collateral trouble after substantial losses in April. Merrill Lynch seized US$800 million in collateral assets and planned to sell these assets on June 18. Bear Stearns had negotiations with JP Morgan, Chase, Merrill Lynch, Citigroup and other investors over the state of the two hedge funds. However, these negotiations did not stop Merrill Lynch from selling the assets. Bear Stearns disclosed that the hedge funds were facing a sudden wave of withdrawals by investors and by July, it closed the two hedge funds, wiping out virtually all invested capital.

The widespread gravity of the valuation problems were highlighted when at the beginning of August, BNP Paribas froze three hedge funds, stating that it is impossible to value the assets due to a lack of liquidity in certain parts of the securitization market. The asset values are reported to have fallen from US$3.47 billion to US$1.6 billion. Paribas stated that the funds were invested in AAA and AA rated structures.[42] In the third week of August, BNP Paribas announced that it has found a way to value the assets of three of its funds and it allowed investors to buy and sell assets. In the same week, the Carlyle Group put up US$100 million to meet margin calls on a European mortgage investment affiliate, with US$22.7 billion in assets. The group issued a statement, explaining that while 95% of the affiliates assets are AAA mortgage backed securities with implicit U. S. government guarantees, the value of the assets has declined due to diminished demand for the securities.

During this period, money market funds that normally purchase asset backed commercial paper (ABCP) adopted a policy of buy only Treasuries. The yields on Treasury bills fell, as a

---

[42] It was not clear what assets these structures held.

result of this flight to quality. This action by money market funds and other investors helped to trigger a corporate funding crisis, with many special investment vehicles unable to roll over their ABCP. This forced vehicles to seek funding from other sources and to sell assets. The problems were not restricted to the U. S. ABCP market.[43]

The difficulty underlying the valuation of collateral and the resulting liquidity and funding problems, affected many special investment vehicles and hedge funds. In the middle of August, the Goldman Sachs fund, Global Equities Opportunities, lost over 30% of its value over several days. Investors injected US$1 billion and Goldman injected US$2 billion of its own money into the fund.[44] Funds in the U. S., Canada, Europe, Australia have experienced funding difficulties, some being forced into bankruptcy. The need to generate cash forced the sale of assets. This affected many quantitative hedge funds, such as Renaissance Technologies, which fell 8.7%. Exchanges rates were affected, as funds reduced their leverage. Selling by hedge funds and nervous investors also forced muni bond prices down.

Other players were affected. Real estate funds were hard hit due to both falling real estate prices and the tumult in the credit markets. The average fund investing primarily in the U. S. lost 17.2% over the first three months of the summer and were down 16.5% on the year (Morningstar Inc). Fund redemptions have forced managers to sell assets in falling markets. KKR Financial Holdings LLC, a real estate firm, 12% owned by Kohlberg, Kravis Roberts & Co. reported in the middle of August that losses threaten its ability to repay US$5 billion in short term debt. It announced plans to raise US$500 million by selling shares to Morgan Stanley and Farallon Capital.

Merger arbitragers were also hit, with many being forced to unwind positions to offset losses. The gap between a target's stock price and the price the buyer has agreed to pay widened to 68% in August, compared to a spread of 11% at the end of June (reported by a Goldman Sachs analysis). Sowood Capital Management liquidated positions in a number of pending mergers and

---

[43] In the second week of August, Coventree, a Canadian investment firm could not sell US$229 million of commercial paper. It shares fell by 80% before trading was stopped. Three days later, in the asset backed commercial paper market, 17 Canadian issuers failed to sell short term debt and sought financing from banks and the market closed down. The funds had backstop lines of credit. However, the criterion for usage is more restrictive in Canada than the U. S. It requires a *general* market disruption. As some funds could still roll over their ABCP, some banks took this as evidence that there was no *general* market disruption and refused to honor their commitments, triggering the funding crisis in Canada. In Europe and Australia, many special investment vehicles reported problems. For example, in Europe Mainsail II, an affiliate of Solent Capital Partners (London) and Synapse Investment Management and in Australia, Ram Home Loans, all reported problems in rolling over the asset backed commercial paper.

[44] The fund agreed to waive its annual management fees.

went into default.[45]  In the fight to gain deals, banks had waived such provisions as the "market out" clause, that allows banks to re-negotiate an underwriting deal if market conditions have deteriorated.  Banks are now having to re-negotiate deals without this weapon in their arsenal. Home Depot delayed and re-negotiated a US$10.3 billion deal to sell its construction supply business to private equity firms.

## 3.6    Transparency

There are a number of different dimensions associated with the general issue of transparency in credit markets.  First, is the complex nature of the products.  Many buyers of these products, such as pension funds, university endowment funds, local counties and small regional banks do not have the in-house technical sophistication to understand the true nature of these products, the frailty of the underlying assumptions used in their pricing and how they might behave in difficult economic conditions.  They rely of the rating agencies and take comfort in the protection that a rating might give.[46]

Second is the lack of transparency with respect to the valuation of illiquid assets. Valuation issues were discussed in the previous section.  For some funds, this is a substantial issue.    For example, in Bears Stearns High Grade Structured Credit Strategies Enhanced Leveraged fund, over 63 percent of its assets were illiquid and valued using models – see Goldstein and Henry (2007).

Third, is the type of assets within a vehicle, such as the percentage of CDOs, CDOs squared, prime, Alt-A and subprime mortgages.  This basic type of information is rarely available and has produced a market for lemons -- investors are unable to observe or unwilling to believe that funds have no exposure to the subprime market.  Synapse closed one of its high grade funds on September 3, 2007, citing "severe illiquidity in the market."  The company stated that the fund had no exposure to the U. S. subprime market.[47]

Fourth, is not knowing the total magnitude of the commitments a financial institution has given, whether it be to back stop lines of credit or loan commitments to private equity buyouts.  A vehicle that relies upon funding from, say, the commercial paper market, will buy a commitment

---

[45] Sowood played credit spread vs. equity prices and was crushed when spread widened while equity markets didn't fall.

[46] King County officials bought US$53 million in Mainsail commercial paper, when rated AAA by S&P. It is now rated B. An official from the county is quoted as stating "we rely heavily on that (*the rating*)" – see Henry (2007).  Words in italic have been added.

[47] SachsenLB had asked for the return of its investment in the fund.  Synapse was unable to find alternative funding.

from a financial institution to provide funding in the event of a market disruption. Financial institutions also offer lines of credit to firms, which can be drawn down and repaid at the firm's discretion. Fulfilling all such commitments could have serious impact on an institution's liquidity. The level of such commitments is not known to outside investors.[48] To avoid holding all the committed capital, the institution will purchase a contract from another institution to provide additional capital if needed. This type of contract is of questionable value if there is a major market disruption, as the institution selling the contract will also have its own liquidity problems.

Fifth, money market funds provide a safe haven for investors to park their money.[49] In order to retain their AAA level rating, they are generally restricted from investing in low credit grade securities. If any of their holdings are down graded, the fund is under pressure to sell these holdings, incurring losses. Unless the fund has sufficient liquidity, it risks its net asset value per share falling below US$1, resulting in a "breaking the buck," which could trigger investors to exit the fund, due to concerns about the safety of their investments. It would also harm the reputation of the fund manager. Some of the money market funds have invested in SIVs. A few of these SIVs have been downgraded, and others are facing downgrading. Many banks have very profitable money market franchises and have implicit commitments to these funds. It is in a bank own interests to buy the fallen assets and to take the loss, rather than risk a run on their money market funds.[50] This is another form of commitment that is not reported.

Finally, many banks hold similar assets to those held by SIVs. In the arrangement process, a bank may hold or warehouse assets until they can be securitized and sold. Banks may hold super senior tranches that are unattractive to investors because of their low yields, despite their high credit rating. The extent of these holdings is often unknown to investors, though the amount of Level 3 assets might be a guide. If SIVs are forced to sell assets, this will drive the

---

[48] Some institutions do disclose the aggregate amount of such commitments. However, at this level of aggregation, the investor does not know the types of firms or individual levels of support provided by the bank.

[49] The size of U. S. money market funds is approximately US$2.70 trillion, according to the Institute of Money Market Fund Association.

[50] Credit Suisse recorded a third quarter loss of US$128 million after removing assets from one of its money market funds. At the beginning of summer, it had money market assets of US$25.5 billion and six months later these had sunk to approximately a quarter of that size. In November 2007, it transferred approximately US$6 billion of the remaining assets onto its balance sheet to meet redemption claims. In December 2007, Columbia Management, a unit of Bank of America, closed its Strategic Cash Portfolio after withdrawals reduced the fund from US$40 billion to US$12 billion. Prior to the shut down, the bank had provided US$300 million in support.

prices down and banks will be forced to mark-to-market similar assets at the lower prices. Investors are uncertain as the magnitude of potential losses the banks might be facing and this is one of the factors contributing to increased volatility in the share prices of banks. It could cause a credit crunch and affect the whole economy. In an attempt to avoid this type of scenario, Bank of America, Citigroup Inc. and JP Morgan Chase & Co. held talks with the U. S. Treasury to establish a new super conduit to buy up to US$100 billion in assets from SIVs.[51]  Because the conduit would be backed by a group of banks, it was hoped that investors would have confidence in buying the fund's commercial paper and this could re-start the ABCP market.

### 3.7 Monolines

Monoline insurers provide insurance to investors that they will receive payment when investing in different types of assets. Given the low risk of the bonds and the perceived low risk of the structured transactions insured by monolines, they have a very high leverage, with outstanding guarantees amounting to close to 150 times capital.[52]  Monolines carry enough capital to earn a triple-A rating and this prevents them from posting collateral.[53]  The two largest monolines, MBIA and AMBAC, both started out in the 1970s as insurers of municipal bonds and debt issued by hospitals and nonprofit groups. The size of the market is approximately US$2.6 trillion, with more than half of municipal bonds being insured by monolines. This insurance wrap guarantees a triple-A rating to the bonds issued by U.S. municipalities.

In recent years, much of their growth has come in structured products such as asset-backed bonds and CDOs. The total outstanding amount of bonds and structured financing insured by monolines is around US$2.5 trillion. According to S&P, monolines insured US$127 billion of CDOs that relied, at least partly, on repayments on subprime home loans and face potential losses of US$19 billion.

Since the end of 2007 monolines have been struggling to keep their triple-A rating. Only the two major ones, MBIA and Ambac, and a few others less exposed to subprime mortgages

---

[51] It is unclear how the fund would have avoided this issue, if assets are purchased at market prices. At the end of the year, the three major banks abandoned the idea of the fund. It had met with a lukewarm response from other investors.

[52] In the event of a bond defaulting, the monoline agrees to make whole interest and principal payments on their respective due dates.

[53] The only exception was ACA which was rated single-A and which guaranteed US$26.6 billion of CDOs backed by subprime mortgages. As long as the monoline maintains its single-A rating, the counterparties don't require the monoline to post collateral even if the value of the securities it insured fell in value.

such as Financial Security Assurance (FSA) and Assured Guaranty, have been able to inject enough new capital to keep their sterling credit rating.[54]

The issue from a systemic point of view is when a monoline is downgraded, all of the paper it has insured must be downgraded too, including the bonds issued by municipalities. And holders of downgraded bonds under "fair value" accounting have to mark them down as well, impairing their capital. Some institutional investors, such as pension funds and so-called "dynamic" or "enhanced" money market funds, may hold only triple-A securities, raising the prospect of forced sales. In addition, some issuers such as municipalities might lose their access to bond markets, which may result in an increase in the cost of borrowing money to fund public projects. Some municipalities and local agencies have issued tender option bonds, which are auctioned weekly or monthly. The underlying collateral – municipal bonds – is insured by monolines. Concern about the credit worthiness of the monolines has caused disruptions to this market. The loss of the triple-A rating could cost investors up to US$200 billion according to Bloomberg. Already, banks have had to write off around US$10 billion of the paper they insured with ACA.[56]

In response to this crisis, a group of banks explored a bailout plan of the largest monolines with the New York's insurance regulator, who was asking the banks to contribute as much as US$15 billion to help MBIA and Ambac preserve their ratings. The main consideration was whether the cost of participating in a bailout was greater than any loss of value in their

---

[54] As mortgage delinquencies rose, so did paper losses. In November, the monoline CIFG, which had exposure of approximately US$6 billion to the US subprime market, received a US$1.5 billion injection from two French banks. After the injection, Fitch re-affirmed CIFG AAA ratings. MBIA and Ambac wrote assets down by a combined US$8.5 billion in the third quarter of 2007. There is now a general market concern that monolines have insufficient resources to honor their commitments. Recently MBIA added US$3.5 billion in write-downs on its credit derivatives portfolio for the fourth quarter of 2007 and a US$2.3 billion fourth quarter loss. MBIA has raised about US$2.5 billion in capital since November and has plans for more, possibly involving obtaining reinsurance on portions of its portfolio[54]. Fitch recently cut its triple-A rating to double-A on Ambac, Security Capital Assurance and FGIC, citing their failure to raise capital. Fitch also put the triple-A rating of CIFG on negative watch, just weeks after affirming its rating. In March, Moody's, then S&P and Fitch, downgraded CIFG from triple-A to single-A plus and rating agencies are now questioning the long-term viability of CIFG as a guarantor as shareholders have declared they may not be prepared to recapitalized the monoline a second time. On the contrary, Ambac benefited from a capital infusion of US$1.5 billion which allowed it to maintain its triple-A rating.

ACA might be the first monoline to file for bankruptcy. S&P slashed ACA rating to CCC, a low junk level, from A in December 2007. The stock of ACA was delisted from the New York Stock Exchange last December and ACA is now on a run-off mode.

[56] There is concern that banks might have to write down an additional US$40 to US$70 billion consecutive to the downgrade or the bankruptcy of monolines..

holdings.[57] On Feb 14, 2008 Eliot Spitzer, New York governor, gave bond insurers three to five business days to find fresh capital, or face potential break-up by state regulators who want to safeguard the municipal bond markets.[58] Under a division of the bond insurers into a "good bank/bad bank" structure, the insurers' municipal bond business would be separated from their riskier activities, such as guaranteeing complex structured credit products. Warren Buffet's Berkshire Hathaway Assurance Corp has already offered to take over the municipal bond portfolios of Ambac, MBIA and FGIC.[59] While these plans would help to restore faith in the municipal bond market, they would do little to help the structured products insured by the monolines.[60] A break-up of the bond insurers would have grave implications for financial institutions that face massive write-downs on guarantees and credit derivatives entered with these monolines.

## 3.8    Systemic Risk

Systemic risk arises if events in one market affect other markets. Many money market managers that normally purchase ABCP abandoned the market and fled to the Treasury bill market, causing a major increase in prices and lowering of yields. The ABCP market relies on the quality of the collateral to minimize the risk of non-performance by borrowers. Lender needs assurance as to the nature of the assets *and* their values. In the breakdown of the ABCP market, there has been reservations about there two dimensions. Some lenders have been concerned that the collateral contains subprime mortgages. This lack of transparency has meant that some borrowers were unable to rollover their debt, even though they had no exposure to the subprime market. There has also been a lack of transparency with respect to the value of collateral. The lack of transparency with respect to the holdings of structured products by monolines and the

---

[57] A potential bailout of FGIC, the third biggest municipal bond insurer in the U.S. with about US$315 billion of insured bonds outstanding, is being led by Calyon, the investment banking unit of France's Credit Agricole. Other bank in the consortium include UBS, Soc Gen, Citigroup, Barclays and BNP Paribas.

[58] According to Eliot Spitzer speed to resolve the monoline recapitalization issue is critical as the diminishing confidence in the monoline to meet their obligations has already hurt markets like the auction-rate securities. Just before Eliot Spitzer injunction, the auction-rate securities market, a US$330 billion slice of the municipal bond market shut down. (These securities are also issued by student loans authorities, museums and many others.) Investors stopped buying securities at regular municipal auctions because they were concerned about the fate of the bond insurers who guarantee around 80 percent of the entire market. The Port Authority of New York and New Jersey found itself paying a rate of 20 percent on US$100 million of its debt, almost quadruple its cost a week before. Auction bonds are initially sold as long-term securities but are effectively turned into short-term securities through auctions where interest rates are determined by bidding that typically occurs every 7, 28 or 35 days. When there are not enough buyers, the auction fails and bondholders who wanted to sell are left holding the securities. Rates at failed auctions are set at a level spelled out in official statements issued at the initial bond sale.

[59] It is not clear that this will help monolines keep their current credit ratings.
[60] The plan advanced by William Ackman did directly address this issue.

associated valuation difficulties, has adversely affected many markets, such as bond auction markets and tender option bonds, that use monolines to provide an insurance wrap.

Even under normal market conditions, many instruments are illiquid and it is difficult to estimate a price. In the turmoil of summer, these problems became insurmountable. These problems were illustrated by BNP Paribas decision to freeze withdrawals from three hedge funds in the beginning of August, stating that it is impossible to value the assets due to a lack of liquidity in certain parts of the securitization market[61].

The effective closure of the ABCP market had many repercussions. For many hedge funds, the inability to rollover debt, has forced them to sell assets and this has affected many diverse markets. First, the collateralized debt obligation market has come under a lot of pressure from this selling to the extent that many funds have found prices to be artificially low and some have resorted to selling other assets. Some funds have closed trading positions by selling "good" assets and buying "bad" assets that were shorted. This has caused prices of good assets to decrease and of bad assets to increase. This type of price reversal has adversely affected some "quant" hedge funds that trade based on price patterns. Hedge funds and institutional investors reduced their leverage by unwinding carry trades. This had the effects of the yen increasing 4% against the dollar, 5.3% against the Euro, 5.8% against the pound, 10.3% against the New Zealand dollar and 11.5% against the Australian dollar.

Many SIVs have backstop lines of credit from banks. The uncertainty of the magnitude of these possible demands has forced banks to hoard cash, making them reluctant to lend to other banks. The three month London inter bank offered rate (LIBOR) increased by over 30 bps during the first part of August. Compounding the banks' funds concerns, are the commitments to underwrite levered buyouts. The reluctance to lend and the tightening of credit standards has affected hedge funds, availability of residential and commercial mortgages, bond auction markets and the lending to businesses.

## Section 4: Issues to be Addressed to Avoid a Repeat of the Subprime Crisis

In the previous section, we identified the major issues that have contributed to the crisis. In this section, we discuss some of the issues that need to be addressed to avoid a repeat of the

---

[61] The asset values are reported to have fallen from US$3.47 billion to US$1.6 billion. Paribas stated the funds were invested in AAA and AA rated structures.

current "subprime" crisis and offer some suggestions on how to move forward.   Table 2
summarizes our main recommendations.

The rating agencies have come in for a lot of attention, though they are only one part of
the story.   Other issues have played an important role in the crisis, such as the difficulties in
valuing illiquid assets, lack of transparency, the underlying design of securities, especially
structured credit products, inadequate risk management and the failure of regulators. Finally we
discuss the future of securitization which is critical to the viability of the "originate-to-distribute"
banking model.

## 4.1   Rating Agencies

In the current crisis, we have witnessed relatively newly rated facilities having their credit
ratings changed from AAA to junk, and the tardy response of agencies to recognize the risk
arising from the holding of subprime mortgages by monolines.   These observations raise the
question of the effectiveness of the methodologies used by the agencies to model loss
distributions for portfolio of assets and the failure of the agencies to recognize the limitations of
their models in a timely manner.

Rating agencies have a long history of estimating the probability of default and the loss
given default for individual obligations. This is not the case for structured products, where there
are many additional difficult issues.  As discussed by Aschcraft and Schermann (2007) subprime
ABS ratings differ from corporate debt rating in a number of different dimensions. Corporate
bond ratings are largely based on firm-specific risk while CDO tranches represent claims on cash
flows from a portfolio of correlated assets. Thus, the rating of CDO tranches relies heavily on
quantitative models while corporate debt ratings rely essentially on the analyst judgment. While
the rating of a CDO tranche should have the same expected loss as a corporate bond for a given
rating, the volatility of loss, that is, the unexpected loss, is quite different and strongly depends on
the correlation structure of the underlying assets in the pool of the CDO.

For structured products, such as ABS collateralized debt obligations, it is necessary to
model the cash flows and the loss distribution generated by the asset portfolio over the life of the
CDO, implying that it is necessary to model *prepayments* [62] and *default dependence* (correlation)

---

[62] Prepayments of principal include both voluntary and involuntary (default) prepayments. Voluntary
prepayments depend strongly on the path followed by interest rates. Interest rate risk is a key source of
uncertainty in the analysis of cash flows.

among the assets in the CDO and to estimate the parameters describing the dependence.[63]  Over the life of a CDO, individual defaults may occur at any time, implying that it is necessary to model the loss distribution over time. This necessitates modeling the evolution of the different factors that affect the default process and how these factors evolve together.[64]  This requires assumptions about the stochastic processes that describe the evolution of the different factors, such as interest rates and prepayment behavior, and the estimation of the parameters describing these processes, which usually requires the use of time series data. If there are major changes in the economy, then these parameters may change, implying that it is necessary to examine the sensitivity of a rating methodology to parameter changes.

It is critical to assess the sensitivity of tranche ratings to a significant deterioration in credit conditions affecting PDs and default clustering. As shown in Fender, Tarashev and Zhu (2008) the impact of PD shocks on CDO tranche ratings is very different than for a corporate bond. It depends critically on the magnitude and the clustering of the shocks and it tends to be non-linear.

If default occurs, it is necessary to estimate the resulting loss. We know from the work of Acharya et al (2003) and Altman et al (2005) that recovery rates depend on the state of the economy, the condition of the obligor and the value of its assets. Loss rates and the frequency of defaults are dependent (correlated): if the economy goes into recession, the frequency of defaults and loss rates increase. It is necessary to model the factors that affect the loss and the joint dependence between the frequency of default and loss. The level of dependence will vary, in general, with the state of the economy.

To have confidence in a model, it is necessary to test model predictions against actual outcomes.[65]  This requires extensive data. Unfortunately, for many types of collateralized products, this type of data simply does not exist, implying that there is little information about the accuracy and robustness of models over different parts of the credit cycle. This type of basic testing does not appear to have been done. Other risk dimensions, such as market liquidity risk have been overlooked and so far have not been factored into credit ratings.

---

[63] There are many different types of factors that influence default dependence. For example, if the local economy deteriorates, then defaults might increase or if a particular sector of the economy deteriorates, then this will adversely affect obligors within the sector.

[64] The recent work of Chava, Stefanescu and Turnbull (2007) examines the multi-period loss distribution for single corporate assets.

[65] See Deventer (2007).

Problems in the origination of subprime mortgages and questionable practices had been public knowledge for some time.[66] The rating agencies clearly state that they do not perform due diligence on the raw data.[67] The current situation is analogous to accountants accepting at face value the figures given to them by firms. There is no auditing function. The current situation is problematic. In moving forward, if data auditing are required, then the issue of compensation both for rating and for auditing needs to be addressed. It is not clear that regulating the originators will solve the problem of faulty data unless there is adequate enforcement. Continuing the analogy, firms are required to follow generally accepted accounting principles, though accounting fraud still occurs.

For the last few years, the characteristics of subprime mortgage borrowers were undergoing major changes due to declining underwriting standards and fraud. The failure to explicitly recognize the changing nature of the underlying data used in model estimation, implied that the probabilities of default, recovery rates, default dependence and the dependence between default and recovery rates were poor estimated. Models need to capture default contagion that exists in local housing markets. There exist statistical techniques, such as data sampling, introducing unobservable heterogeneity and different prior distributions, which have the potential to ameliorate some of these problems.[68] For collateralized structures, there is the need for more transparency about (a) the types of models used by the agencies; (b) the assumptions about the data used to rate a particular structure; and (c) the accuracy and robustness of the rating methodologies to the underlying assumptions. Current methodologies failed due to the use of inappropriate assumptions derived from historic data for corporate CDOs with tranches much wider than for ABS CDOs. They also failed to model both default and recovery dependences.

To rate the commercial paper of a SIV, there are additional factors to consider. First, an assessment of the backstop lines of support and other contingent funding in the case of market disruptions. The rating agencies rate the contingent sources of funding available to a vehicle. Second, for an investor to buy asset backed commercial paper (ABCP), they need to know the *nature* of the assets supporting the paper and the *value* of the collateral. The agencies are clear that they make no statement about valuation. Yet if the value of the collateral deteriorates, this

---

[66] See footnote 24 and 25 for additional references.

[67] In testimony to Committee on Banking and Urban Affairs, both agencies stated that they accepted the raw data without any form of checking- for Moody's see Kanef (footnote 3, 2007) and for S&P see Tillman (P7, 2007).

[68] See the recent papers by Chava, Stefanescu and Turnbull (2007) and Duffie, Eckner, Horel and Saita (2006).

adversely affects the credit worthiness of the commercial paper. Thus logically, one must address the issue of the valuation of the collateral, if one is to assess the credit worthiness of the vehicle.

There is the need to be more transparency with respect to the meaning of a rating for commercial paper or medium term notes for structured products and investment vehicles.[69] What does a rating actually consider and what assumptions are made in reaching a rating decision? At present the onus is on the investor in an ABCP to understand exactly what a rating means, the underlying assumptions and data used to derive such a rating and the limitations of the rating methodology. This is demanding a lot from investors, given the lack of transparency. Again, there is also the need for more transparency about the methodologies used to assess the different factors and how these considerations are incorporated to reach a final decision. There is a long list of investors who foolishly interpreted an ABCP credit rating as measure of the underlying credit worthiness, being unaware of the limitations of the methodologies.

## 4.2    Valuation

In the current crisis, one of the fundamental problems is the valuation of the securitized tranches for mortgage assets. To value a simple credit default swap requires specification of the probability of default of the obligor over the life of the swap and the loss if default occurs. These probabilities and loss rates are not those estimated by rating agencies. For pricing purposes, we need the *price of risk* for each factor that affects the loss distribution. The price of risk for a factor relates the risk of loss to value. Market prices for swaps with standardized maturities of one, three, five, seven and ten years now exist for a large number of obligors, though the market for non-standardized maturities is still illiquid. The existence of market prices means that models can be calibrated to match existant prices. Once we can infer prices of risk for a particular obligor, we can price non-standard swaps written on the same obligor.

For synthetic CDOs,[70] valuation becomes more complicated, as it is necessary to model default and recovery dependences among the obligors in the CDO. For each credit default swap within the structure, the probabilities of default over the life of the CDO are inferred using the current market prices for all the swaps on the particular obligor. It is necessary to patch together the individual credit swaps to produce a price for the whole structure. The typical types of models used by financial institutions are relatively simple and static in nature,[71] and do a

---

[69] The same issue has been raised about the rating for municipal bonds compared to corporate bonds, as both default and recovery rates are quite different for the same rating.

[70] Synthetic CDOs are structures that contain credit default swaps.

[71] Schönbucher (2003, chapter 10) provides a clear introduction to this topic.

relatively poor job of pricing all of the different tranches. Transparency in pricing and the liquidity of the market has greatly increased following the introduction of credit indices and the trading of tranches written on the indices. This has also facilitated models to be calibrated to the prices of the individual tranches of an index. However, for synthetic CDOs that do not contain the same obligors as in an index, additional assumptions are required for pricing.

For pricing assets such as mortgages, auto-loans or credit cards, the difficulties associated with valuation greatly increase, as there are few prices that can be used for calibration. Even under normal conditions, markets are illiquid. The types of models used to estimate the credit ratings of CMOs could be extended to pricing. This can be achieved by estimating the prices of risk associated with each factor that affects default and the resulting loss. However, this requires market prices. Mortgage related credit indices now exist, allowing the prices of risk to be estimated. Unfortunately, mortgage portfolios may differ substantially from the characteristics of the index, as there is wide heterogeneity across different types of mortgages. Standardization of structures will help to improve liquidity and pricing, as recently suggested by Lagarde (2007),[72] though there are many practical difficulties with this type of suggestion. If prices of risk cannot be estimated, another approach is to use the credit rating for the mortgage structure and then make some heroic assumption about what yield an asset with a given rating commands. The use of this type of model has meant that in the current crisis, as rating agencies have down graded assets, there has been automatic write-downs. There are two difficulties with this approach. It assumes that ratings are both accurate and timely. The second difficulty is the nature of the required heroic assumptions. Apart from pragmatism, there is little justification.

## 4.3    Transparency

The lack of transparency has affected many different players: SIVs, financial institutions, money market funds and monolines. Many SIVs hold asset backed securities. For investors to understand the exposure of a SIV, it would be necessary to peel back the layers of the structure of an asset backed security, such as a CLO or CDO squared, to reveal the underlying assets. It is not clear that SIVs would be willing to reveal this information. Even if investors had the information, modeling the price dependence among the different assets is a non-trivial undertaking.

The lack of transparency has affected financial institutions in a number of different ways. First, banks hold or are warehousing mortgages before securitization, as well as tranches of structural products that they are in the process of selling to investors. In the credit crisis, as the

---

[72] C. Lagarde is France's minister of economy, finance and employment.

value of credit sensitive instruments has declined, financial institutions have been forced to write down the value of these assets. In many cases, investors have been surprised by the magnitude of the write-downs.

Second, is the level and diversity of commitments, both explicit and implicit, given by banks. The first explicit type of commitment is that to underwrite levered buyouts. For the first part of 2007, the competition was such that many banks offered to provide financing, without the protection of an adverse market clause that gives them an escape route. The total magnitude of these commitments was often not disclosed on a timely basis. The second type of explicit commitment occurred when banks gave backstop lines of credit to their sponsored SIVs. A bank will often provide a backstop line of credit, usually for a fraction of the total amount the vehicle needs. There is a lack of clarity as to the total level of these commitments and a bank's ability to honor such commitments.

The first type of implicit commitment arose because of reputation concerns. Bank sponsored SIVs are off balance sheet vehicles, created and managed by banks, who earn revenue from the generous management fees. To qualify for off-balance sheet treatment, a bank should not be exposed to risk. This test is usually satisfied, given the typical SIV structure. Yet in a number of cases, banks to protect their reputation have brought vehicle assets onto their balance sheets. The second type of implicit commitment arose because a number of banks run enhanced money market funds that invested in subprime assets. The banks have stepped in to support the funds in order to avoid breaking the buck, as the value of the subprime assets declined. During 2007 bank shareholders have had a series of negative surprises due to the lack of information about the different types and magnitude of implicit commitments.

For banks, 10K statements offer little information about actual holdings of assets being warehoused and there is a lack of clarity with respect to the total level of bank commitments. Regulators could request that this information be reported on a regular basis. This would provide investors with information about a bank's exposure and the effects on valuation if downgrades occur. A similar requirement is also needed for monolines. The recent Senior Supervisors Group, (April 11, 2008) report surveys twenty financial firms. It found that in some cases the level of disclosure was extensive. However, even in these cases, the level of disclosure was at an aggregated level, that it would hide many important details about the true nature of an institutions exposure.

The lack of transparency in the pricing of subprime structures has been a major issue. Illiquid assets are difficult to value even in normal markets. One way to improve pricing transparency and liquidity is to encourage the trading of indices based on standardized baskets of the assets. Trading in these indices would improve transparency and provide guidance for calibrating models used for non-standard baskets of assets. The last few years has seen the development of such indices,[73] though in some cases, the asset structures used to define the underlying assets in the index lack transparency. There is a need for more simplicity and transparency in design.

## 4.4    Instrument Design

The lack of transparency and liquidity for many asset backed securities such as subprime mortgages, auto-loans and more exotic CDO squared securities have been a major issue in the current crisis. Moving forward, the emphasis will be on simplicity and transparency. In the near future, we can expect investors to focus on relatively simple and liquid products that can be easily standardized and valued.

The introduction of credit default swap indices in late 2002 enhanced the development of the credit swap market by improving the transparency. Investors could observe bid/ask spreads for the different tranches on the index. Indices, such as the ABX, have been introduced for the mortgage market. However, the heterogeneity of the mortgage market means the prices of the sub-indices are of limited help for calibrating particular mortgage structures. To improve the pricing transparency, more sub-indices are required. For more exotic instruments, such as CDO squared, there are two issues. First, is the identification of obligors in each of the underlying CDOs, and second, the modeling of default dependence. Given the limited success of models for simple CDOs, modeling a CDO squared is problematic.[74] It is unclear what steps can be taken to improve the pricing transparency of such complex instruments.

New products exposed to "gap" risk have been introduced such as Constant Proportion Portfolio Insurance (CPPI) and Constant Proportion Debt Obligation (CPDO). Both products are leveraged investments whose return depends on the performance of an underlying trading strategy. Quite often positions are taken into the available credit indices such as iTraxx and CDX. Typically, the performance of these trading strategies is exposed to "gap" risk which is not captured with traditional option pricing models because of the continuous paths of the Brownian

---

[73] Examples of such indices are the CDX and iTraxx for synthetic CDO structures, LCDX for loans, ABS for asset backed securities and CMBX for commercial mortgage backed securities.
[74] See Jarrow, Mesler and van Deventer (2007).

motion assumed by these models. The rating of these products was initially based on such flawed models. Most of the CPDOs were subsequently downgraded with huge losses. For example, Moody's on November 26, 2007 announced that Tyger Notes, a CPDO based on financial credits from UBS lost 90 percent of its value after its net asset value fell below the level that triggered its unwind. Moody's later on cut the rating of the other CPDOs.[75]

## 4.5    Regulatory Issues

The Basel-based Financial Stability Forum (FSF) whose membership consist of central bankers, regulators and finance ministers from many countries, presented to the G-7 Ministers and Central Bank Governors at their meeting in Washington in April 2008 a set of 67 recommendations for increasing the resilience of markets and institutions going forward. Many of these recommendations aim at improving transparency in financial markets, regulatory oversight and coordination across regulatory bodies at the national and international levels. Among the proposals are increased capital requirements for structured credit products and the trading book to explicitly capture default and event risk of credit exposures held in the trading book, faster disclosure of losses by banks and increased cross-border monitoring of banks by regulators. However, there are a number of issues at the heart of the current credit crisis which need an urgent regulatory response.

First, the lax lending standards over the last few years have been a major contributor to the current crisis. Both regulators and risk managers ignored the implications. A decline in underwriting standards for subprime mortgages (and also auto-loans and credit cards) implies the probability of default for subprime borrowers increases and the default dependence for this class of borrowers' increases. This, in turn, lowers the value of structures containing subprime mortgages.   There needs to be regulatory requirements for the random sampling of the raw mortgage data and the methodologies used to generate the multi-period loss distributions need to be flexible enough to incorporate the changing regime nature of the data.

In response to the credit crisis, there has been a rush to introduce new laws regulating lending standards.  However, without effective enforcement mechanisms such efforts will be of little value.  The responsibility for enforcement needs to be clearly defined, especially given state and fragmented federal divisions.  To motivate financial institutions that sell structured products to undertake the appropriate due diligence, they could be required to hold the equity portion of

---

[75] The size of the CPDO market is only approximately US$3.5 billion.

the structures they sell to investors.  This way they bear the direct costs from mispricing due to inappropriate assumptions about the nature of the loss distribution.

Second, the issue of counterparty risk has arisen at two levels.  Many banks had put options that allowed them to put back mortgages to originators in the case of delinquency.  In a number of cases when banks attempted to exercise this option, the originators did not have the assets to reimburse the banks.  The credit derivative market is an over-the-counter market, implying that there is always counterparty risk.  In the current credit crisis, the ability of some counterparties to honor their commitments has been called into question.

While banks keep track of their counterparty exposures, the determination of the value of the total exposure (after netting) to a counterparty and the posting of collateral has been based on relatively simple forms of rules.  The reliance both on credit ratings as a measure of the risk of a counterparty and the valuation of illiquid assets have been contributing factors to the crisis.  The rating agencies have done a poor job in assessing on a timely basis the credit worthiness of many of the counterparties and the valuation of illiquid assets is difficult even in normal times. Both banks and regulators have failed to recognize that a credit event that adversely affects a bank may also adversely affect both the credit worthiness of a counterparty and the value of the bank's collateral.  Moving forward, there is a need to understand and model the dependence between the valuation of the cash flows from a counterparty and its ability to pay, what is known as "wrong-way" counterparty credit exposure.  Regulators should ensure that methodologies adequately account for this type of dependence.

Third, banks have many implicit commitments that do not appear on the balance sheets. It is not surprising, and should have been expected, that many banks to protect their reputations brought assets on to their balance sheets, adversely affecting their capital and forcing some banks to raise additional capital.  Regulators should request that these implicit commitments be recognized for capital calculations and that these contingencies given explicit recognition in Value-at-Risk measurements.  For practical implementation, regulators should be ready to specify some minimum probability of occurrence.  Whether it is desirable to hold capital against these commitments is another issue.  There are two types of contingencies.  The first type of contingency is the case of a vehicle having refinancing problems that are isolated to the particular vehicle and the bank transferring assets onto its balance sheet.  The second type of contingency is the case of a general market disruption.  To hold capital against this type of event could be

---

[78] Adrian and Shin (2008) argue that mark-to-market accounting can cause pro-cyclicality.

prohibitive. Explicit and implicit commitments should also be reported in the bank's accounts, so investors know of potential future liabilities.

Fourth, the requirement that assets in the trading book be marked-to-market (or model) has come under attack from some bankers.[78] The central issue is the belief that in the current crisis, market or model prices do not reflect the true value of an asset and consequently companies are being forced to recognize losses on assets they had no intention of selling. In the current crisis, companies have recognized huge write-downs, causing investors to become increasingly concerned about the credit worthiness of financial institutions, which have been forced to raise capital at unfavorable prices. One recent proposal is for auditors to estimate the maximum losses for a financial institution and recognized these losses in the profits.[79] Given that auditors have in general even less expertise than credit rating agencies at making such estimates and rating agencies have done a poor job in the current crisis, investors will be forced to rely on their own estimates without the benefit of market opinion. The outcome may be a "market for lemons" with even greater declines in asset values than under the mark-to-market framework.

The valuation of illiquid assets is difficult under normal markets conditions and problematic when markets are in turmoil. In the current crisis, there was a failure to adjust distributional assumptions due to misrepresentation of the underlying risk associated with subprime borrowers. For assets recorded in the banking book, a loss reserve is required. The magnitude of the reserve is usually based on the expected loss over the next year. In general, in the current crisis this has been under estimated, given the inappropriate distributional assumptions. If markets are mispricing assets in the current crisis, it is probably due to the lack of transparency with respect to the nature of the assets. Investors need to assess the value of an institution's assets. The focus of the debate should be on the issues of transparency of the assets held by institutions and the valuation of these assets.

Fifth, the systemic nature of the crisis has arisen because of wide spread ownership of structures containing subprime and the circular dependence between refinancing and collateral valuation. Regulators failed to recognize the existence of positive feedback mechanisms and to understand their implications for the financial system.[80] If asset values decline, ability to refinance declines, valuation of counterparty collateral declines, the value of monoline assets

---

[79] See Guerrera and Hughes (March 14, 2008).

[80] The recent U.K. House of Commons Treasury Committee Report on the failure of the Northern Rock Bank notes the failure of the regulators to recognize the implications of positive feedback mechanisms.

declines and the value of the guarantees given by monolines declines.  Regulators were bind to the impending crisis.  To avoid a repeat, there needs to be more transparency as to the nature of assets held by different institutions.  To achieve this will require increased cooperation of regulators across national boundaries.  There is also the need to explicit recognize feedback mechanisms and understand their implications for the financial system.

Many financial institutions failed to anticipate the liquidity risks associated with some of their businesses.  Regulators need to understand the risks that can be caused by liquidity and require that these risks be formally recognized in measuring the risk of an institution.

Rating agencies failed to understand the risks arising from structured products. Given the regulatory importance attached to ratings, the onus is on regulators to monitor the rating agencies with respect to data quality, methodologies and rating designations.

## 4.6 Risk Management Issues

The Senior Supervisors Group issued a report in March 2008 that identifies risk management practices that differentiate financial institutions that have been able to weather relatively well the financial market turmoil, from those that did not perform well and have been exposed to large credit write-offs.  Firms that performed relatively well:

- adopted a comprehensive view of their exposures: they shared quantitative and qualitative information more effectively across the organization so that they were able to identify very early the sources of significant risk and had more time to evaluate the appropriate actions to be taken; these firms have risk management committees that meet on a weekly basis to discuss all significant risk exposure across the firm, and include senior management (CEO, CFO, CRO, COO,..) and the heads of business lines as well as legal and compliance officers, all as equal partners;

- had in place rigorous internal processes to value complex and potentially illiquid securities: they had independent in-house expertise to assess the credit quality of structured credit assets and were not relying only on the assessment of credit rating agencies;

- enforced active controls over the consolidated organization's balance sheet, liquidity and capital positions: they aligned the treasury functions more closely with risk management processes, incorporating information from all businesses in global liquidity planning, including

actual and contingent liquidity risk; these firms had in place internal pricing mechanisms that incentivize the business units to better control balance sheet growth and ensure that contingent liquidity risk does not outweight expected returns;

- relied on a wide range of risk measures: they had adaptive risk measurement processes and systems that could rapidly alter underlying assumptions in risk measures to reflect current circumstances; in particular, they complemented VaR measures with forward-looking stress testing;[82] stress tests specially designed to allow firms to estimate the economic benefits of diversification and the impact of correlation risk in stressed markets. Box 1 discusses "cliff" effects or strong non-linearities that characterizes the risk of subprime CDO tranches, and limit the usefulness of VaR measures under some circumstances.

The report also emphasizes the role of senior management to articulate the strategy of the firm that will increase its franchise value. Imbedded within this responsibility is the task of finding the right balance between the desire to develop new businesses and the risk appetite of the firm. In particular, senior management plays a critical role in identifying and understanding material risks and acting on that understanding to mitigate excessive risks. Internal communication across the firm is also critical to performance in stressed market conditions. The existence of organizational silos in the structures of some firms appeared to be detrimental to the firms' performance during the turmoil. Firms that avoided significant losses cited a degree of integration among the liquidity, credit, market and finance control structures. Firm-wide risk management has become a necessity to keep pace with the growth of risk taking.

Finally, compensation has been cited as a major issue in the current credit crisis. In particular, the incentive structure tied loan originator revenues to loan volume, rather to the quality of the loans to be securitized. There is a need to better align compensation and other incentives with the interests of the investors and of the shareholders of the firm, and to find the appropriate balance between short-run and long-run performance, and between individual business unit goals and the firm-wide objectives. The originate-to-distribute business model have created incentives for both firms and individuals that have conflicted with sound underwriting practices, risk management best practices and the interest of investors and shareholders.

**4.7 The Future of Securitization**

---

[82] VaR measures perform well under normal conditions but are unable to capture severe market shocks.

The "originate-to-distribute" banking model depends on securitization which gives institutions the chance to extract and segment a variety of potential risks from a pool of portfolio credit risk exposures, and to sell these risks to investors. Credit restructuring techniques have developed both in the corporate credit sector and the mortgage sector to enable lenders to repackage loans into notes, securities, or credit derivatives with a variety of credit-risk features. These specially engineered securities allow commercial banks to transfer credit risk off their books. The securities can then be sold to a wide pool of investors, most of which would not have been interested in purchasing bundles of loans.

The purpose of securitization is to redistribute credit risk to the end-investors, such as pension funds, insurance company, mutual funds, hedge funds and individual investors. The current crisis shows it was not the case, since most of the risks were transferred from the balance sheet of the banks to the SIVs which were funded with short-term commercial paper with back-up liquidity lines with the sponsor banks. This construct can be viewed as a regulatory capital arbitrage instead of a true redistribution of risk. These SIVs were funding medium-term and hard-to-value assets with short-term money market securities exposing the vehicule to the risk of a market disruption.[83] When banks were unable to roll the ABCP funding these SIVs, and market liquidity had totally evaporated for subprime related assets, banks to preserve their reputation had no other alternative, but to take back the assets on their balance sheet.

The design of the SIVs can be altered to make them less sensitive to market disruptions. There are a number of ways to achieve this. Currently, some of the extant short term commercial paper gives the vehicle the option to extend the maturity of the debt. Usage of this option could be expanded. Another type of option would be to allow the vehicle to convert the paper into one or two year floating rate debt. The option could be contingent on the event of a market disruption. The cost of the option would be relatively small, given that the probability of a market disruption is small. The cost of these modifications would be to decrease expected profits.

To reduce problems in the risk assessment and valuation of securitized due diligence is required from both originators and investors to ensure that there is transparency with respect to the quality of the credit being securitized and the information given to the structurers, rating agencies and investors. Structured credit products that results from the repackaging of individual credits should have a relatively simple design, so that they are well understood by all the players

---

[83] This was also the root of the problems with the British bank Northern Rock Plc, that caused the first bank run in 140 years in Britain.

(structurers, rating agencies, investors, regulators,…). Rating methodologies need to be improved, so that there is a clear representation of the risks involved in a structured credit. Any rating system loses its purpose if a triple-A security can be downgraded to junk within a few days. Investors also should rely more on their internal rating system to appraise the risk of these structured products. If they are unable to rate these products, they should stay away from them.

## 5    Summary

Federal Reserve Chairman Ben Bernanke said at the opening meeting in April 2008 of the G-7 in Washington that failures in the so-called "originate-to-distribute" model of credit extension were the root of the current crisis. It broke down at a number of key points, including at the stages of underwriting, credit rating and investor due diligence. Financial institutions that had bought structured credit products coming from the securitization of subprime loans did not have adequate risk management or liquidity plans in place. Ben Bernanke also said "these problems notwithstanding, the originate-to-distribute model has proven effective in the past and with adequate repairs could be so again in the future".

Securitization allows banks to move assets off their balance sheets, freeing up capital and spreading the risk among many different players. These are real benefits. The recent crisis in the subprime market has raised many questions about the future of securitization. For the last three years, conditions within both the housing sector and the economy have been changing. In an environment with relatively low interest rates, investors have searched for yield. This generated an increased demand for securitized subprime mortgages. The incentives given to originators and the reduced need for due diligence contributed to a decline in the underwriting standards and increased fraud. The increased use of adjustable rate mortgages (ARMs) and the lower underwriting standards has generated an environment of increasing delinquency rates in ARM subprime mortgages and also auto-loans and credit cards. Special investment vehicles financed their purchases with short term liabilities, implying a duration gap between assets and liabilities and their ability to roll over debt depended on the value of their assets.

In this paper, we have identified many of the factors that have contributed to the crisis, from the search for yield, agency problems resulting in lax underwriting standards, failure to identify a changing environment, poor risk management by financial institutions, lack of transparency, the limitation of extant valuation models and the failure of regulators to understand the implications of the changing environment for the financial system. The paper addresses the

different issues and offers suggestions on how to move forward. Our recommendations are summarized in Table 2.

Appendix 1: Biggest losses/write-downs since the beginning of 2007, in billions of US$ as of April 2008 (Source: Bloomberg)

| | |
|---|---|
| Citigroup | $40.9 |
| UBS | $38 |
| Merrill Lynch | $31.7 |
| Bank of America | $14.9 |
| Morgan Stanley | $12.6 |
| HSBS | $12.4 |
| JP Morgan Chase | $9.7 |
| IKB Deutsche | $9.1 |
| Washington Mutual | $8.3 |
| Deutsche Bank | $7.5 |
| Wachovia | $7.3 |
| Credit Agricole | $6.6 |
| Credit Suisse | $6.3 |
| RBS | $5.6 |
| Mizuho Financial Group | $5.5 |
| Canadian Imperial Bank of Commerce | $4.1 |
| Societe Generale | $3.9 |

**Table 1**

Central Banks Interventions

| | |
|---|---|
| European Central Bank | August 9, Euro 95 billion (US$130 billion)<br>August 10, Euro 61 billion (US$84 billion) |
| U. S. Federal Reserve | August 9, US$24 billion<br>August 10, US$38 billion |
| Bank of Canada | August 10, C$1.64 billion (US$1.55 billion) |
| Bank of Japan | August 10, Y100 billion (US$8.39 billion) |
| Swiss National Bank | August 10, SF 2 -3 billion (US$1.68 -2.51 billion) |
| Reserve Bank of Australia | August 10, A$4.95 billion (US$4.18 billion) |
| Monetary Authority of Singapore | August 10, S$1.5 billion (US$0.98 billion) |
| | |
| | |

**Table 2: Summary of Recommendations to Avoid a Repeat of the Current Subprime Crisis**

**1      Rating Agencies**

1. For a particular instrument that is being rated, there is the need for a clear statement about the assumptions employed to derive a given rating. For example, for rating an instrument issued by a special purpose vehicle, does the agency look at the nature of the underlying assets, the sources of back-stop financing, the nature of clauses in the indenture of the instrument that depend on the market value of the underlying assets? A clear statement is required about what factors contribute to an assigned rating.

2. The meaning of a rating needs to be clearly stated. For example, is a rating a measure of the probability of default occurring over the life of the instrument, a measure of the expected loss averaged over the life of the instrument or something else?

3. Sensitivity of tranche ratings to shocks in PDs and correlation should be disclosed as it can be highly non-linear in certain circumstances.

4. Different assets classes should have different rating names, to avoid possible confusion.

5. Clarity is required about the data sources used to reach a rating. Is the agency accepting data from a third party and has the agency done anything to check if there have been structural changes in the data sources? How has it checked the data to justify the validity of its distributional assumptions?

6. Due diligence on the quality of the assets being securitized is essential for the rating of structured credit products to be credible.

7. Some proof of the efficacy of a rating scheme needs to be provided by an agency, in order to provide some degree of confidence in the methodology.

8. In any situation where an institution pays an agency to rate one of the institution's instruments, conflicts of interest arise. For any instrument, the rating agency should document the nature of these conflicts.

**2      Valuation**

1. There is a need for the simplification and standardization of instruments. Many instruments have become too complicated, making reliable pricing or risk management problematic.

2. For many different asset classes, the industry needs to develop markets for indices written on standardized assets. This will help in price discovery and for pricing related assets.

### 3    Transparency

1. For banks there is the need for transparency as to the magnitude of explicit commitments arising from lines of credit, backstop supports, and funding for levered buyouts.

2. For banks there is the need for transparency as to the magnitude of implicit commitments that arise from reputation concerns. Examples are the implicit commitments to off balance sheet vehicles and enhanced money market funds.

3. There is the need for greater transparency with respect to the nature of assets held by financial institutions, especially assets that are difficult to value (level three assets).

### 4    Instrument Design

1. There is the need for less complexity in the design of instruments. There is the need to demonstrate that valuation methodologies can be validated with respect to external prices and risk management is feasible.

2. There is the need to design instruments that allow for market disruptions.

### 5    Regulatory Issues

1. Minimal Federal lending standards are required across all states in order to avoid the problems arising from lobbyist pressuring state lawmakers to have state laws relaxed.

2. In cases where a counterparty posts collateral, regulators need to recognize "wrong-way" counterparty credit exposure in determining capital requirements.

3. Fair value accounting has come in for criticism due to its pro-cyclical nature.  A possible solution is to allow investment banks to place an asset either in the trading book or the bank book. This decision is made at the time the bank buys the asset. There is the need for some rules to avoid cherry picking by banks -- that is banks cannot keep on switching an asset back and forth as market conditions change.

4. There is the need for compulsory random sampling of mortgage lending practices and mortgage delinquency rates, especially in major states. The responsibility for such duties must fall to an independent body.

5. Regulators need to recognize the effects of pro-cyclicality in stress testing and scenario analysis.

6. For financial institutions that are of a size or importance such that their failure threatens the stability of the financial system, there is the need for consistent regulation across such institutions.

7. The fragmented regulator system both at the Federal level and at the state level needs to be improved.

8. Regulators need to understand the risks that can be caused by liquidity and require that these risks be formally recognized in measuring the risk of an institution.

9. Regulators to monitor the rating agencies with respect to data quality, methodologies and rating designations.

## 6    Risk Management Issues

1. Firms should adopt a comprehensive firm-wide risk management and share quantitative and qualitative information in risk management committees that meet frequently and include senior management as well heads of business lines, legal and compliance officers, all as equal partners.

2. Rigorous internal processes should be put in place to value complex and illiquid securities and internal credit quality assessment should complement external ratings.

3. The treasury functions should be closely aligned with risk management to plan and control balance sheet, liquidity and capital positions.

4. Traditional Value-at-Risk measures should be complemented by forward-looking stress testing to capture the impact of severe market shocks.

5. The incentive and compensation system should be reviewed to better align the interest of all the participants in the securitization chain with the interest of the investors and shareholders of the firm. Also the incentive compensation scheme should be closely related to long-term, firm-wide profitability.

### Box 1: "Cliff" effects or non-linearities in the risk of subprime CDO tranches

Banks and rating agencies have based their risk assessments on market assumptions which didn't reflect the severity of the current environment after the housing market started to deteriorate and market liquidity evaporated. It has long been suggested to complement standard risk analyses based on "normal market conditions"[84] by "stress-testing" methods and "scenario analysis" which take into account liquidity risk and other complexities in order to ensure that banks are aware of the potential losses they might incur in highly unlikely but plausible scenarios.[85] It is well known that Value-at-Risk (VaR) models do not accurately capture "gap risk", i.e., extreme market events. It is clear that if the term structures of default probabilities, the losses given default and the default correlations of the mortgage bonds in the pool of the subprime CDOs, had been reasonably stressed we would have known the extent of the potential losses. Traditional Value-at-Risk risk measurement models are static in nature and do not capture the impact on potential losses of limited liquidity and complex non-linearities embedded in structured credit products.

In particular, the nature of the risks involved in holding a triple-A rated super-senior tranche of a subprime CDO was completely missed by all the players: rating agencies, regulators, financial institutions and investors. Subprime CDOs are in fact CDO squared as the underlying pool of assets of the CDO is composed of subprime MBS bonds which are themselves tranches of individual subprime mortgages. A typical subprime trust is composed of several thousand individual mortgages, typically around 3 to 5,000 mortgages for a total amount of approximately a billion dollars. The distribution of losses of the mortgage pool is tranched into different classes of MBS bonds from the equity tranche, typically created through over-collateralization, to the most senior tranche rated triple-A. A typical subprime CDO has a pool of assets composed of MBS bonds rated double-B to double-A, with an average rating of triple-B. The problem is that the initial level of subordination for a triple-B bond is relatively small, between 3 and 5 percent and the width of the tranche is very thin 2.5 to 4 percent maximum. As prepayments occur the level of subordination of the lower tranches increase, in relative terms, and can reach 10 percent over time. Assuming a recovery of 50 percent on the foreclosed homes, means that a default rate of 20 percent on subprime mortgages, which is realistic in the current environment, will most likely hit most of the triple-B tranches. Moreover, it is also most likely that in the current

---

[84] A majority of institutions calculate their VaR based on historical simulation which is clearly a problem in the current environment as we have gone through a period of overall very low volatility.

[85] See, for example, Crouhy, Galai and Mark (2006).

downturn in the housing market and recessionary economic environment, the loss correlations across all the triple-B tranches will be close to one. As a consequence, if one triple-B tranche is hit, it is most likely that most of the triple-B tranches will be hit as well during the same period. And, given the thin width of the tranches, it is most likely that if one MBS bond is wiped out, they all will be wiped out at the same time, wiping out the super-senior tranche of the subprime CDO. In other word, we are in a binary situation where either the cumulative default rate of the subprime mortgages remains below the threshold that keeps the underlying MBS bonds untouched and the super-senior tranches of subprime CDOs won't incur any loss, or the cumulative default rate breaches this threshold and the super-senior tranches of subprime CDOs could all be wiped out.

# References

Acharya, V., S. Bharath and A. Srinivasan "Understanding the Recovery Rates on Defaulted Securities", Working paper, London Business School. 2007.

Adrian, T. and H. S. Shin, Liquidity, Monetary Policy, and Financial Cycles", Current Issues in Economics and Finance. January/February, 2008.

Agarwal, S. and C. T. Ho. "Comparing the Prime and Subprime Mortgage Markets", Federal Reserve Bank of Chicago, Essay on Issues, Number 241, August 2007.

Altman, E. and B. J. Karlin. "Defaults and Returns in the High-Yield Bond Market: The Year 2007 in Review and Outlook", Working Paper, New York University Salomon Center, February 7, 2008

Altman, E., B. Brady, A. Resti and A. Sironi "The Link Between Default and Recovery Rate: Theory and Empirical Evidence and Implications", Journal of Business, 78, 6, 2203-2228.

Angell, C. and C. Rowley, "Breaking New Ground in the U. S. Mortgage Lending", FDIC Outlook, Summer 2006.

Aschcraft, A. B. and T. Schermann "Understanding the Securitization of Subprime Mortgage Credit", Working paper, Federal Reserve Bank of New York, December 2007.

Bernanke, B. "The Subprime Mortgage Market", Chairman of the Board of Governors of the US Federal Reserve System, May 17, 2007.

Bernanke, B. "The Housing Market and Subprime Lending", Chairman of the Board of Governors of the US Federal Reserve System, June 5, 2007.

Chava, S., C. Stefanescu and S.M. Turnbull, "Modeling Expected Loss", Working paper, London Business School, (2007).

Cole, R. T. "Subprime Mortgage Market", testimony for the U.S. Senate Committee on Banking, Housing and Urban Affairs, Board of Governors, Federal Reserve System, March 22, 2007.

Coy, P. "Why Subprime Lenders Are in Trouble", Business Week, March 2, 2007.

Crouhy, M., D. Galai and R. Mark, The Essentials of Risk Management, McGraw-Hill, 2006

Davies, P. "Mortgage Fraud Is Prime", Wall Street Journal, August 18, 2007.

Davies, P. J. J. Hughes and G. Tett, "So What Is It Worth", Financial Times (London), September 13, 2007.

Doms, M., F. Furlong and J. Krainer, "House Prices and Subprime Mortgage Delinquencies", Federal Reserve Bank of San Francisco News Letter, Number 2007-14, June 7, 2007.

Deventer, D. R., "The 2007 Credit Crisis: A Case Study", Kamakura Corporation, September, 2007.

Duffie D., A. Eckner, G. Horel and L. Saita, "Frailty Correlated Default", working paper, Stanford University.

Fender, I., N. Tarashev and H. Zhu, "Credit Fundamentals, ratings and value-at-Risk: CDOs versus Corporate Exposures", BIS Quarterly Review, March 2008, 87-101.

Fitch Ratings, "Subprime worries? Financial Guarantors Exposure to Weaker RMBS Originators/Services", March 14, 2007.

Financial Stability Forum, "Report of the Financial Stability Forum on Enhancing Market and Institutional Resilience", April 7, 2008.

Goldstein, M. and D. Henry, "Bears Bets Wrong", Business Week, October 22, 2007.

Guerrera F. and J. Hughes "AIG urges "fair value" rethink", Financial Times (London), March 14, 2008.

Henry, D. "Anatomy of a Rating Downgrade", Business Week, October 1, 2007, 66-67.

House of Commons Treasury Committee Report, "The run on the Rock", 24 January 2008.

Jarrow, R. A., M. Mesler and D. R. van Deventer, "CDO Valuation: Fact and Fiction", Kamakura Corporation, December 19, 2007.

Kanef, M. Testimony before the Committee on Banking, Housing and Urban Affairs United States Senate, September 26, 2007.

Lagarde, C. "Securitization Must Lose the Excesses of Youth", Financial Times (London), October 9, 2007.

Moody's Investment Service, "Update on Moody's Perspective on the Ongoing Liquidity Crisis and the Rating of Debt Programs in the SIV Sector", Prepared Remarks, September 5, 2007.

Morgenson, G. "Inside the Countrywide Financial Lending Spree", New York Times, August 26, 2007.

Mortgage Bankers Association, "Delinquencies and Foreclosures Increase in the Latest MBS National Delinquency Survey", March 13, 2007.

Mortgage Bankers Association, Letter to the Board of Governors of the Federal Reserve System, August 15, 2007.

O'Brien, J. "Relevance and Reliability of Fair Values", Board of Governors of the US Federal Reserve System, November 11, 2005.

Office of the Comptroller of the Currency, "Survey of Credit Underwriting Practices, 2005",

Polizu, C. "An Overview of Structured Investment Vehicles and Other Special Purpose Companies", Standard and Poors, 2006.

Schönbucher, P. J. Credit Derivatives Pricing Models, Wiley and Sons, New Jersey, (2003).

Senior Supervisors Group, "Observations on Risk Management Practices During the Recent Market Turbulence", March 2008.

Senior Supervisors Group, "Lending-Practice Disclosures for Selected Exposures", April 11, 2008.

Simpson, G. R. "Lender Lobbying Blitz Abetted Mortgage Mess", Wall Street Journal, December 13, 2007.

Tillman, V. A. Testimony before the Committee on Banking, Housing and Urban Affairs United States Senate, September 26, 2007.

EXHIBITS

"A"   Truth-in-Lending          Shows amount to be paid  $ 1,412.41

"B"   Shows that this was a Subprime loan. The lender did not take in account that

    The borrower could not aford this loan. (income is inflated by mortgage company)

    (Please see report on Subprime loans)

"C"   Excessive fees: Loan was discounted for processing  $6,160.50, Email fee $35.00,

    EPA endorsment fee $95.00 (who/what is that)

**Countrywide Home Loans, Inc.**
939 North Avenue Suite 680
Chicago, IL. 60622


RE: Philanders and Tracy Hardy Account# 168607026

Dear Sirs,

With this letter, I hereby exercise my rights under the Federal Truth-in-Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23, to rescind the above referenced mortgage loan. The Truth-in-Lending disclosure statement was defective for the following reasons:
1. Excessive/hidden fees
2. unauthorized fees
3. Other violations

Pursuant to 15 U.S.C. § 1635(f), my right to rescind this loan extends for three-years as a result of this defective Truth-in-Lending disclosure statement. This rescission notice has been sent to you within that time period.

Please consider this letter a "Qualified Written Request" per RESPA and as such I am demanding an accounting of my loan including the following: loan disbursements, charges, all payments paid to date, and the principal balance.

Please be advised that your security interest in my home is now void per 15 U.S.C. § 1635; Regulation Z § 226.23 and you have twenty-days to return all of the payments I have made on this loan and to do your part to terminate the security interest in my home.

Thank you for your immediate attention to this matter and govern yourself accordingly.

Philanders Hardy
(773) 933-5336
7806 South Luella Avenue
Chicago, IL 60649

Philanders Hardy
7806 S. Luella Ave.
Chicago, Ill 60649-5009


July 23, 2008


Countrywide Home Loans
P. O. Box 650070
Dallas, TX 75265-0070

Loan No. 168607026

Attention, Ms. Carol Mell – Tax Service Department

RE: Property Taxes
    Parcel   20254200860000 and Parcel 20254200830000
    Property location is 7806 S Luella Ave Chicago, IL 60649.

Dear Ms. Mell I am requesting that Countrywide pay the taxes on the above mentioned
property.


Thank for your prompt attention to this matter.

Sincerely,


Philanders Hardy

## CERTIFICATE OF SERVICE

This is to certify that I, __Philanders Hardy__ Pro Se attorney for the Plaintiff have forwarded this date a true and correct copy of the above and foregoing document, by U.S. mail, postage fully prepaid, to Countrywide Home Loans, Inc, HomEQ Servicing, Ametec Funding Group LLC, Real Source Title LLC, New Century Mortgage Corporation, and/or their agents of records.

This the ___8ᵀᴴ___ day of ___August___ , 2008

Philanders Hardy
7806 S. Luella Ave.
Chicago, Ill. 60649